## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

DEAN A. MONCO; JOHN S. MORTIMER; )
WOOD, PHILLIPS, KATZ, CLARK & )
MORTIMER, )
 )
  Plaintiffs, )
 ) No. 17 C 6882
  v. )
 ) Judge Thomas M. Durkin
ZOLTEK CORPORATION; ZSOLT RUMY; AND )
TORAY INDUSTRIES, INC., )
 )
  Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiffs Dean A. Monco, John S. Mortimer, and Wood, Phillips, Katz, Clark, & Mortimer seek recovery of legal fees from defendants Zsolt Rumy, Zoltek Corporation and Toray Industries, Inc. (which purchased Zoltek in 2014) under a *quantum meruit* theory for their representation of Zoltek in patent litigation spanning the course of 20 years. Plaintiffs also allege that Rumy tortiously interfered with Monco's expectancy of recovering legal fees from that litigation. Currently before the Court are Plaintiffs' motion to dismiss Zoltek's Counterclaim under Federal Rule of Civil Procedure 12(b)(6), R. 58, and Rumy's motion to dismiss Plaintiffs' Second Amended Complaint for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), R. 239. For the following reasons, the Court grants in part and denies in part both Plaintiffs' motion to dismiss Zoltek's Counterclaim, and Rumy's motion to dismiss the Second Amended Complaint as to him.

# BACKGROUND[1]

Defendant Zoltek is a carbon fiber manufacturer based in Missouri. R. 217 ¶ 9. Defendant Rumy, a Florida or Missouri citizen,[2] was the founder and majority shareholder of Zoltek until defendant Toray, an international Japanese corporation, acquired Zoltek in 2014. *Id.* ¶¶ 10, 11. Plaintiff Wood Phillips is an Illinois law firm, and plaintiffs Monco and Mortimer are attorneys with Wood Phillips licensed to practice, and living, in Illinois. *Id.* ¶¶ 7, 8.

In 1996, Zoltek hired Monco and Mortimer to represent Zoltek in litigation conducted in Washington, D.C. to enforce a Zoltek patent ("Stealth litigation"). *Id.* ¶¶ 1-2, 18-20. That litigation lasted for 20 years. *Id.* ¶ 2. Monco and Mortimer were paid for their work largely on a contingency basis. *Id.* ¶ 3. In February 1996, Zoltek entered into a retainer agreement with Wood Phillips. *Id.* ¶ 19. In April 1996, Zoltek signed a second retainer agreement directly with Wood Phillips attorneys Monco and Mortimer. *Id.* ¶ 20. Plaintiffs maintain that the April 1996 agreement displaced the February 1996 agreement. *Id.* Then, in 2011, Monco, Mortimer and Zoltek signed a modification to the April 1996 retainer agreement. *Id.* ¶ 58. Rumy signed each agreement on behalf of Zoltek. *Id.* ¶¶ 99-100; R. 243-1; R. 243-2.

In each agreement, Zoltek, Wood Phillips, Monco and Mortimer (as applicable) agreed to:

---

[1] Additional background facts are set forth in the Court's two previously issued opinions in this case. *See* R. 183; R. 221.
[2] The Second Amended Complaint alleges that Rumy is a Missouri citizen. R. 217 ¶ 10. Rumy alleges he is a Florida citizen. R. 38 at 1. Because no party claims that Rumy is an Illinois citizen, his precise citizenship is not relevant.

submit themselves to the jurisdiction and venue of the Federal District Court for the Northern District of Illinois for resolution of any and all disputes under [the agreement].

R. 243-1 at 6; R. 243-2 at 7; R. 243-3 at 3.[3] The February 1996 agreement provided in relevant part that if Zoltek terminated Wood Phillips:

> ZOLTEK shall pay WOOD, PHILLIPS for no less than the value of legal services provided to ZOLTEK by WOOD, PHILLIPS, which payment shall be made from any future recoveries by ZOLTEK promptly upon receipt of such recoveries.

R. 243-1, at 5.

The April 1996 retainer agreement similarly provided that if Zoltek terminated Monco and Mortimer:

> MONCO/MORTIMER shall be entitled to receive from ZOLTEK no less than the reasonable value of its services performed on ZOLTEK's behalf up to the date of termination, to be paid from funds received by ZOLTEK upon completion or termination of the litigation.

R. 243-2, at 5. The 2011 modification agreement provided that Monco and Mortimer would be paid $200 per hour for their time in exchange for a reduction in their percentage from any judgment or settlement from 45% to 38%. R. 243-3, at 2-3. The 2011 modification agreement also provided that 150% of any attorneys' fees paid by Zoltek to Plaintiffs would be deducted off of any recovery and credited to Zoltek before distribution of fees from the remainder under the April 1996 retention agreement, and stated:

_____

[3] The 2011 modification agreement incorporated this forum selection clause, changing the financial terms of the parties' relationship, but noting "All other terms of the Retainer Agreement shall remain the same and continue in full force and effect." R. 217 ¶ 100; R. 243-3, ¶ 8.

> ZOLTEK and MONCO/MORTIMER each acknowledge that they have reviewed this MODIFICATION to the Retainer Agreement with counsel prior to signing, and that each has entered into it freely, voluntarily and knowingly.

*Id.* at 2-3.

In late 2014, Toray purchased Zoltek, and Zoltek started operating as a wholly-owned subsidiary of Toray. R. 217 ¶ 9, 71. Plaintiffs allege that Toray acquired "all rights to the Zoltek Patent and any recovery from the lawsuit" in conjunction with the purchase. *Id.* ¶ 71.

Ultimately, the relationship between Zoltek and Monco and Mortimer deteriorated. During a crucial meeting in St. Louis in July 2016, Zoltek's other outside counsel, Missouri-based Thompson Coburn, told Monco and Mortimer that the April 1996 retainer agreement was being terminated and proposed paying them an hourly rate for their work going forward. *Id.* ¶¶ 75, 77. Rumy also allegedly made false statements about Monco and Mortimer to a Toray representative about the value of the Stealth litigation being zero and that Monco and Mortimer jeopardized the case by not taking damage discovery. *Id.* ¶¶ 102, 115. After the meeting, Zoltek terminated Monco and Mortimer as counsel, substituted another firm as lead counsel in the Stealth litigation, and refused to pay Monco and Mortimer for overdue bills. *Id.* ¶¶ 78-80. A few weeks later, the Stealth litigation settled for $20 million. *Id.* ¶ 87. Plaintiffs did not recover anything from the settlement.

Plaintiffs filed suit in September 2017. R. 1. Thereafter, in January 2018 Plaintiffs amended their complaint, asserting a claim against Rumy for tortious interference with prospective economic advantage, and a claim against Zoltek and

4

Toray for recovery under a *quantum meruit* theory. R. 28 ¶¶ 91-108. In February 2018, Rumy moved to dismiss the amended complaint for lack of personal jurisdiction, arguing that he had conducted his business entirely outside of the State of Illinois, only occasionally contacting the Illinois Plaintiffs by phone or email in his capacity as a Zoltek representative. R. 37. The Court agreed, granting Rumy's motion but expressly permitting Plaintiffs to further amend their complaint if they believed they could set forth a plausible basis for minimum contacts between Rumy and Illinois. R. 183. In the meantime, Zoltek answered the amended complaint and filed a Counterclaim against Plaintiffs. R. 40. Plaintiffs moved to dismiss Zoltek's Counterclaim in March 2018. R. 58.

Then, in October 2018, Plaintiffs filed a Second Amended Complaint. R. 217. The Second Amended Complaint repeats Plaintiffs' claim against Zoltek and Toray, alleging that they accepted Monco and Mortimer's services throughout the difficult and lengthy Stealth litigation and deserve to recover for those services on a *quantum meruit* basis (Count I). *Id.* ¶¶ 88-97. The Second Amended Complaint also adds a claim by all Plaintiffs against Rumy under *quantum meruit* (Count II). *Id.* ¶¶ 98-109. There, Plaintiffs allege that throughout the Stealth litigation, Rumy had regular contact with Plaintiffs in Chicago including regarding their payment (or non-payment) for services, and that while he agreed to personally assume responsibility for directing the Stealth litigation on Zoltek's behalf and resolving Plaintiffs' claim for fees, in actuality, motivated by his personal interests in the litigation, Rumy secured a substantial share of the settlement for himself, and has yet to pay Plaintiffs,

notwithstanding the personal benefit he received from their services. *Id.* Finally, Plaintiffs replead Monco's claim against Rumy for tortious interference with prospective economic advantage (Count III), in which they allege that Rumy purposely interfered with Monco's expectation to earn substantial legal fees through the Stealth litigation by inducing Zoltek to terminate Monco as its attorney and negotiating a secret deal with Zoltek pursuant to which he would receive half of the Stealth litigation settlement, and from which he has yet to pay Monco. *Id.* ¶¶ 110-20.

Rumy again moved to dismiss for lack of personal jurisdiction. R. 239. This time, Plaintiffs allege the Court has jurisdiction over Rumy as to the tortious interference claim because Rumy signed the April 1996 retainer agreement on Zoltek's behalf as its largest shareholder, and thus that he is "so closely related" to the underlying dispute arising from that agreement that it was "foreseeable that Rumy would be bound by the jurisdiction/venue clause." R. 217 ¶¶ 13-14, 108. Plaintiffs also allege that this Court has specific jurisdiction over Rumy with respect to both the *quantum meruit* and tortious interference claims because he sent hundreds of emails and placed "likely" over a dozen telephone calls to Plaintiffs in Illinois throughout the course of the Stealth litigation. *Id.* ¶¶ 101, 103.[4]

For its part, Zoltek answered the Second Amended Complaint, and repeated its Counterclaim alleging Plaintiffs' professional negligence and breach of fiduciary

---

[4] While the Second Amended Complaint's "Jurisdiction and Venue" section calls out only the Court's jurisdiction over Rumy generally based on the forum selection clause, in Count II, it describes the email and telephone communications Rumy directed to Plaintiffs in Illinois, and upon which Plaintiffs rely for the Court's personal jurisdiction over Rumy as to both counts. *See* R. 217 ¶¶ 13-14, 101, 103, 108.

duty, and seeking a declaratory judgment that the April 1996 retainer agreement and 2011 modification agreement between Monco, Mortimer and Zoltek are void. R. 243 at 45-46. In so doing, Zoltek noted that its Counterclaim as plead in its answer to the Second Amended Complaint remained the same, and thus was still subject to the parties' briefing on Plaintiffs' earlier-filed motion to dismiss. *Id.* at 1. The Court will first address Plaintiffs' motion to dismiss Zoltek's Counterclaim, and then Rumy's motion to dismiss the Second Amended Complaint.

## ANALYSIS

### I. Plaintiffs' Motion to Dismiss Zoltek's Counterclaims

As noted, Zoltek asserts three counterclaims. Count I seeks a declaratory judgment that the April 15, 1996 retainer agreement and the 2011 modification agreement between Zoltek, Monco and Mortimer are void as impermissible modifications of a fee agreement. Count II alleges professional negligence by Plaintiffs. And Count III alleges that Plaintiffs breached their fiduciary duties. R. 243. In their motion to dismiss, Plaintiffs argue that Count I fails to state a claim and Counts II and III are time-barred. *See generally* R. 58. At the parties' request, the Court heard oral arguments on Plaintiffs' motion to dismiss Zoltek's Counterclaim on May 7, 2018. The Court will address Plaintiffs' arguments in turn.

### A. Standard

A Rule 12(b)(6) motion challenges the "sufficiency of the complaint." *Berger v. Nat. Collegiate Athletic Assoc.*, 843 F.3d 285, 289 (7th Cir. 2016). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of

the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 366 (7th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Tobey v. Chibucos*, 890 F.3d 634, 646 (7th Cir. 2018).

## B.   Analysis of Counterclaims

### 1.   Count I: Declaratory Judgment as to Agreements

Plaintiffs contend first that Count I, which seeks a declaratory judgment that the April 1996 retainer and 2011 modification agreements are void as impermissible modifications of a fee agreement, fails to state a claim upon which relief can be granted. Plaintiffs assert three basic arguments in support. First, Plaintiffs contend that the agreements are not void, and the 2011 modification is not even voidable. Second, Plaintiffs assert that Count I is barred by the 10-year statute of limitations on contract actions. Finally, Plaintiffs argue that Count I is moot in any event, since Plaintiffs seek recovery only on a *quantum meruit* basis, and there is no "actual

controversy" that a declaratory judgment would resolve. *See generally* R. 59; R. 88. The Court addresses each argument below, beginning with Plaintiffs' argument that Count I is moot.

### a. Mootness

Plaintiffs argue that any claim based on the agreements is moot because their fee agreement terminated when Zoltek discharged Plaintiffs as counsel, and they can seek and are seeking only compensation in *quantum meruit*. R. 59 at 7. Zoltek responds with three arguments, each focusing on Plaintiffs' alleged reliance on the April 1996 retention agreement. First, Zoltek contends that its declaratory judgment action is not moot because Plaintiffs rely on the retention agreements to establish jurisdiction. R. 83 at 8-9. The Court addresses the merits of Plaintiffs' position on jurisdiction later, but it is sufficient to note here that generally, a forum selection clause can survive the termination of an agreement for purposes of establishing jurisdiction.[5] *Advent Electronics, Inc. v. Samsung Semiconductor, Inc.*, 709 F. Supp. 843, 846 (N.D. Ill. 1989) ("In the absence of contractual language expressly or implicitly indicating to the contrary, a forum selection clause survives termination of the contract."). Furthermore, Zoltek cites no authority to suggest that the entry of its

---

[5] The Court addressed one exception to this rule in its October 26, 2018 order granting Toray's motion to dismiss for lack of jurisdiction, R. 221. Specifically, under *Vance v. Gallagher*, 280 F. App'x 533 (7th Cir. 2008) and Illinois law, "when an attorney and a client enter into a fee agreement, if the client terminates the attorney, the contract ceases to be operative," and the attorney may recover fees only "under the equitable theory of *quantum meruit*." *Id.* at 537. Where the attorney "assert[s] a claim for fees based on *quantum meruit*," reliance on a forum selection clause in a fee agreement is "misplaced," since "a *quantum meruit* sounds in restitution rather than contract." *Id.*

declaratory judgment would automatically invalidate the forum selection clause for this purpose in any event. Zoltek also argues that Monco and Mortimer, as Wood Phillips partners at all relevant times, are plaintiffs in this action only because of the April 1996 retention agreement, which purports to be between Monco, Mortimer and Zoltek. R. 83 at 9. Finally, Zoltek argues that although Plaintiffs seek recovery under *quantum meruit*, they rely upon the fee structure in the April 1996 retention agreement. *Id.* But again, Zoltek cites no authority to support its apparent contention that this so-called "reliance" by Plaintiffs on the April 1996 retention agreement creates an "actual controversy" now ripe for the Court in 2018, where there is no dispute that Zoltek exercised its right to terminate the agreement in 2016 in any event. Thus, although Zoltek contends that "Plaintiffs claims are littered with reliance on the [April 1996 retention agreement]," R. 83 at 8, because in actuality their claims sound in *quantum meruit* and tortious interference, and because Zoltek fails to persuade the Court otherwise, the Court agrees with Plaintiffs that Count I is moot.

### b.    Failure to state a claim

Although having determined that Count I is moot the Court need not consider Plaintiffs' remaining arguments, it bears mentioning that those arguments also support dismissal. Plaintiffs contend that unethical fee agreements are not void as a rule, and that Count I fails to "state facts supporting any declaration that the 2011 Modification even was voidable." In support, Plaintiffs point out the parties'

representations that they had independent counsel review the modification, and that both sides entered into it "freely, voluntarily and knowingly." R. 59 at 7.

Zoltek argues in response that fee agreements renegotiated to the benefit of the attorney after representation begins are "presumptively improper," and that the modifications arising out of the April 1996 agreement made Monco and Mortimer full partners with Zoltek, a structure that requires close scrutiny under the law. R. 83 at 10. But Zoltek cites just three cases, none of which the Court finds compelling, and none of which even demonstrate that an attorney-client agreement can be void as opposed to voidable.[6] Two of the cases involve divorce proceedings and are easily distinguished. *Id.* (citing *In re Marriage of Pagano*, 537 N.E.2d at 405 ("Where a transaction is entered into between an attorney and his client during the existence of that relationship and the attorney benefits . . . it is presumed that the attorney exercised undue influence.") and *In re Marriage of Bennett*, 476 N.E.2d 1297, 1302 (Ill. App. Ct. 1985) ("A fee arrangement which is modified to an attorney's advantage during the relationship of attorney and client is presumptively fraudulent.")). Simply put, as a sophisticated, publicly-traded company, Zoltek could not have been at risk of undue influence by Plaintiffs in the same way that the divorce clients were in *Pagano* and *Bennett*. The parties' acknowledgements in the 2011 modification agreement serves as further evidence of this. *Id.* (presumption of invalidity overcome

---

[6] Indeed, the cases Zoltek cites make clear that "attorney-client transactions are not void in Illinois but merely presumptively fraudulent." *See Monco v. Janus*, 583 N.E.2d 575, 583 (Ill. App. Ct. 1991) (quoting *In re Marriage of Pagano*, 537 N.E.2d 398, 405 (Ill. App. Ct. 1989)).

when modification "made with unquestionable good faith, fairness, adequacy of consideration and freedom from undue influence.").

Moreover, Zoltek's reliance upon *Monco v. Janus*, 583 N.E.2d 575 (Ill. App. Ct. 1991) does not add much to the analysis, even while it involves one of the plaintiffs from this case. There, the court held that the defendant (Monco) failed to rebut the presumption of undue influence over an attorney-client transaction with plaintiff—a sole proprietor in a landscaping business—which resulted in a 50/50 ownership interest in patent rights to an invention. *Id.* at 581-83. The court concluded that there was insufficient evidence that Monco gave adequate consideration to support his interest where the patent idea originated with the plaintiff, and also that Monco failed to fulfill his obligation to ensure that plaintiff, who had "extreme trust" in Monco, sought review of the transaction by independent counsel. *Id.* at 582. The Court finds little parallel here, and Zoltek provides little assistance. While under Illinois law, it is Plaintiffs' burden to demonstrate a lack of undue influence once the presumption is established, Zoltek fails to cite a single case even remotely analogous to the facts here, such that the Court is unable to determine whether or how the rule Plaintiffs put forward applies to a sophisticated client like Zoltek. What is more, Zoltek already exercised its option to terminate its relationship with Plaintiffs (and the agreements governing same), and never sought to rescind the agreements about which it now complains in any event. *See Deutsche Bank Nat. Trust Co. v. Hart*, 67 N.E.3d 299, 307 (Ill. App. Ct. 2016) (holding that "[a] voidable contract . . . may be ratified and enforced by the obligor" but a "party seeking to prevent its enforcement

must have promptly sought rescission" (citing *Zirp-Burnham, LLC v. E. Terrell Associates, Inc.*, 826 N.E.2d 430 (Ill. 2005))). Having concluded that Zoltek has failed to state a plausible claim that circumstances existed which would have permitted voiding the agreements, the Court finds grounds to dismiss Count I on this issue alone.

### c.    Timeliness

Finally, Plaintiffs argue that the 10-year statute of limitations on written contracts, 735 ILCS 5/13-206, bars any claim on the April 1996 agreement, the terms of which give rise to Count I. R. 59 at 7; R. 88 at 3. Plaintiffs assert that Zoltek's declaratory judgment action regarding alleged voidness was ripe for adjudication when the parties signed and began performing under the agreement in 1996. R. 59 at 7; R. 88 at 3. Zoltek contends that the statute of limitations on written contracts should not apply here, attempting to analogize its declaratory judgment action to a third-party action "which was not ripe until the April 1996 [retainer] agreement was asserted against Zoltek" through this lawsuit. R. 83 at 11. Neither party points the Court to a case discussing when a claim for voidness or voidability accrues. In the sole case Zoltek cites, plaintiffs brought a breach of contract (and more) action against their construction contractor, and the contractor then asserted its own breach of contract actions against each of its subcontractors for the same work. The Illinois Supreme Court found that the statute of limitations on such a third-party action "begins to run on the date the third-party plaintiff is served with the underlying action." *Guzman v. C.R. Epperson v. Construction, Inc.*, 752 N.E.2d 1069, 1076 (Ill.

2001). But other than to declare Count I "a derivative claim, seeking a declaration that Plaintiffs cannot assert the April 1996 [retainer agreement], as modified," Zoltek offers no explanation for how *Guzman* controls here. And nor can the Court fathom one. Instead, because there is no evidence that Zoltek, a sophisticated, publicly-traded corporation, lacked knowledge at the time of signing of an alleged basis to have its agreements with Plaintiffs declared void, the Court questions whether any such claim was waived in any event. *See Deutsche Bank Nat. Trust Co.*, 67 N.E.2d at 307 (finding that party waived the opportunity to attack mortgage contract when instead of promptly seeking rescission, they ratified it by accepting its benefits). Having determined that Count I is moot and fails to state a claim in any event, the Court need not decide this issue.

### 2. Counts II and III: Professional Negligence and Breach of Fiduciary Duty

Plaintiffs also argue that Zoltek's professional negligence and breach of fiduciary duty claims are time-barred under both the applicable statute of limitations, 735 ILCS 5/13-214.3(b), and the statute of repose, 735 ILCS 5/13-214.3(c). The statute of limitations applies to all claims against attorneys—"tort, contract or otherwise"— and incorporates the discovery rule, requiring an action "be commenced within 2 years from the time the person bringing the action knew or reasonably should have known of the injury for which damages are sought." 735 ILCS 5/13-214.3(b); *see also White v. Richert*, 2016 WL 3582083, at *4 (N.D. Ill. June 28, 2016) (statute of limitations applies to all claims against attorneys, "including . . . breach of fiduciary duty or legal malpractice" (quoting *Evanston Ins. Co. v. Riseborough*, 5 N.E.3d 158,

166 (Ill. 2014))). In turn, the statute of repose, to which the discovery rule does not apply, provides that an action against an attorney "may not be commenced in any event more than 6 years after the date on which the act or omission occurred." 735 ILCS 5/13-214.3(c); *see also Fricka v. Bauer*, 722 N.E.2d 718, 723 (Ill. App. Ct. 1999) ("The statute of repose . . . includes no . . . provision making it subject to the discovery rule reflected in the limitations section.").

Generally, "[d]ismissing a complaint as untimely at the pleading stage is an unusual step, since a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations." *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*, 782 F.3d 922, 928 (7th Cir. 2015) (citation omitted). Dismissal on this basis "is appropriate only where the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense." *Id.* Indeed, if there is any "conceivable set of facts, consistent with the complaint, that would defeat a statute-of-limitations defense, questions of timeliness are left for summary judgment (or ultimately trial), at which point the district court may determine compliance with the statute of limitations based on a more complete factual record." *Id.* Nevertheless, in providing that an action against an attorney may not be commenced *at all* more than six years after the date on which the negligent act or omission occurred, 735 ILCS § 5/13–214.3(c), the statute of repose "place[s] an outer limit on the time for commencing an action." *Hester v. Diaz*, 805 N.E.2d 255, 259 (Ill. App. Ct. 2004) (quoting *Sorenson v. Law Offices of Theodore Poehlmann*, 764 N.E.2d 1227, 1229 (Ill. App. Ct. 2002)). Indeed, "[i]f the statute of repose did not exist, then the statute of

limitations would essentially be limitless in certain undiscovered situations." *Id.* (citing *Sorenson*, 764 N.E.2d at 1230).

### a. Statute of limitations

Plaintiffs argue that Zoltek's professional negligence and fiduciary duty claims are based on acts and omissions occurring years ago, including their alleged "failure to obtain evidence of infringement for many years before 2012," "entering into Section 6 of the April 15, 1996 Retainer Agreement, in 1996," and other conduct occurring before 2012 and therefore plainly outside of the 6-year statute of repose, let alone the 2-year statute of limitations. R. 59 at 10. In response, Zoltek argues for application of the discovery rule to toll the 2-year statute of limitations, alleging that Zoltek could not and did not learn of the basis for its professional negligence and breach of fiduciary duty claims until it engaged Thompson Coburn for a "second opinion" in the summer of 2016, and that engagement revealed significant flaws in Plaintiffs' handling of the case. R. 83 at 6-7, 12-13.

A review of the Counterclaim does not suggest that Zoltek knew of Plaintiffs' alleged malpractice as it occurred. To the contrary, Zoltek even alleges that Plaintiffs concealed their malpractice, and, as noted, that malpractice was revealed only after another firm reviewed the records in 2016. R. 243 ¶¶ 85-87. Zoltek's Counterclaim also does not suggest beyond a doubt that a diligent reasonable person should have known of or discovered Plaintiffs' acts earlier. Thus, the Court cannot find based only on the Counterclaim and its exhibits that there is no set of facts that would defeat the timing defense raised by Plaintiffs. *See Sanders v. JGWPT Holdings, Inc.*, 2016

WL 4009941, at *9 (N.D. Ill. July 26, 2016) (declining to dismiss claims on statute of limitations grounds where plaintiffs alleged defendants orchestrated a scheme to mask unlawfulness, and the complaint did not suggest that a reasonable person should have known or discovered the unlawful acts sooner). In declining to dismiss the Counterclaim on statute of limitations grounds now, the Court notes that subsequent discovery may reveal a basis to do so later in any event. By way of example, discovery may reveal that Zoltek had information in 2009 that called into doubt Plaintiffs' performance, thus causing it to engage another firm, and triggering the statute of limitations. For now, it is sufficient to note that Plaintiffs may re-raise their statute of limitations defense later if warranted.

### b.    Statute of repose

Plaintiffs also contend that Counts II and III are barred by the 6-year statute of repose. R. 59 at 10; R. 88 at 5-8; 735 ILCS § 5/13-214.3. Zoltek argues that this view ignores the allegations of actionable conduct within the 6-year period prior to suit, as well as the allegations that Plaintiffs concealed evidence of their malpractice. R. 83 at 13-14.

Zoltek points the Court to *Sanders v. JGWPT Holdings, Inc.*, to conclude that the statute of repose does not begin until "the acts of representation end." 2016 WL 4009941, at *9. Zoltek urges the Court to conclude that the statute of repose did not commence until 2016 when Zoltek terminated Plaintiffs as counsel, about a year and a half before Zoltek filed its Counterclaim, and therefore well within the statute of repose. R. 83 at 14. But the *Sanders* court applied the fraudulent concealment

exception (discussed below) to hold that the complaint was timely, without deciding when the statute of repose period would have otherwise begun. *See id.* (declining to dismiss plaintiff's claims based on statute of limitation or repose because plaintiff's "allegations that Defendants concealed their true intentions from Plaintiffs" and "worked to hide their wrongful deeds" convinced the court that "discovery may uncover facts to support fraudulent concealment").

Contrary to any suggestion otherwise in *Sanders*, Illinois law makes clear that the statute of repose is not automatically tolled because the attorney-client relationship is ongoing. *See Mauer v. Rubin*, 926 N.E.2d 947, 956 (Ill. App. Ct. 2010) ("the statute of repose is not tolled merely by the continuance of the attorney-client relationship." (citing *Witt v. Jones & Jones Law Offices, P.C.*, 646 N.E.2d 23, 25 (Ill. App. Ct. 1995)). Nor is it tolled by the attorney's "continuing duty to correct any defect or omission related to the work product" after it is complete. *Fricka*, 722 N.E.2d at 720; *Lamet v. Levin*, 39 N.E.3d 136, 140 (Ill. App. Ct. 2015) ("the period of repose is not tolled by the attorney's ongoing duty to correct past mistakes"). It is also questionable whether a theory of continued negligence—akin to the continuing violation theory in tort—is available to toll the statute of repose. *See Memorylink Corp. v. Motorola, Inc.*, 2010 WL 11534462, at *4 (N.D. Ill. Aug. 5, 2010) (application of "continuous course of *negligent* representation" theory "is at least questionable in the context of legal malpractice" (emphasis in original)); *see also Mauer*, 926 N.E.2d at 956 (drawing textual distinctions between statutes of repose in medical versus legal malpractice actions, and noting in dicta that those differences may mean

continuous course of negligent representation theory is not available in the latter context).

Generally, the period of repose "begins to run on the *last date* on which the attorney *performs the work involved in the alleged negligence*." *Fricka*, 722 N.E.2d at 722 (emphasis added); *see also Tidemann v. Schiff, Hardin & Waite, et al*, 2005 WL 475163, at * (N.D. Ill. Feb. 28, 2005) ("The statute of repose runs from the time of the acts or omissions alleged to have caused injury; the fact that the attorney-client relationship endures thereafter does not affect the repose period" (quoting *Sorenson*, 764 N.E.2d at 1230)). But this rule is easier said than applied. It is clear that "where there is a single overt act from which subsequent damages may flow, the statute begins to run on the date the defendant invaded the plaintiff's interest and inflicted injury . . . despite the continuing nature of the injury." *Terra Found. for American Art v. DLA Piper LLP*, 61 N.E.3d 202, 214 (Ill. App. Ct. 2016) (quoting *Feltmeier v. Feltmeier*, 798 N.E.2d 75 (Ill. 2003)). But even as courts doubt the availability of a continuous course of negligent representation theory, they provide breathing room for cases in which the injury is "cumulative or aggregate in nature." *Mauer*, 926 N.E.2d at 955-57 (even assuming statute of repose for legal malpractice allowed for a continuous course of negligent representation theory, it was inapplicable where "the injury alleged . . . is not cumulative or aggregate in nature"); *see also Memorylink Corp.*, 2010 WL 11534462, at *4 ("even if the [continuous course of negligent conduct] theory is applicable," plaintiff did not allege that defendants "engaged in any 'cumulative' conduct . . . which compounded [plaintiff's] injury").

Here, Zoltek's Counterclaim was first filed on February 15, 2018. R. 40. A careful review of the Counterclaim reveals Zoltek's theory that Plaintiffs' alleged malpractice began when it declined to alter an ill-fated strategy adopted as early as 1996, and that Zoltek terminated Plaintiffs "for cause" in the summer of 2016 due to Plaintiffs' (allegedly just discovered) "gross mismanagement" of the Stealth litigation. Between its rehiring of Plaintiffs in 2011 and their ultimate termination in 2016, Zoltek points the Court to several actions by Plaintiffs that it alleges fell within the 6-year period prior to its Counterclaim. Specifically, Plaintiffs' failed efforts at settlement in 2012 and 2016 that allegedly "weakened Zoltek's negotiating position because Plaintiffs had no actionable infringement evidence," pursuit of a damage valuation that "required reliance on a theory narrowly permitted and heavily criticized by the Federal Circuit," retention and direction of an additional law firm to pursue legislative action and lobbying," and "[s]eeking discovery known to be prohibited by the state secret bar." R. 83 at 5-6 (citing R. 40 ¶¶ 24, 75-78, 86-90).

From these allegations, the Court is unable to conclude when the statute of repose commenced. Zoltek seems to plead a continuous course of negligent representation theory that results in injury which is "cumulative" or "aggregate" in nature, pointing to delayed settlement of the Stealth litigation and excessive fees and costs incurred.[7] While Illinois courts have questioned the viability of this doctrine,

_____

[7] At oral argument held at the request of the parties on May 7, 2018, counsel for Zoltek seemed to advance a theory that the statute of repose began anew for each separate act of malpractice alleged, and that each act of malpractice thus had its own period of repose. Because Zoltek did not advance this argument in its brief, and

the Court is not prepared to say at this stage that it is unavailable here, particularly where there is no "single overt act" to point to from which injury flows, and where Zoltek alleges the malpractice continued up until Plaintiffs' termination in 2016. *Terra Found. for American Art*, 61 N.E.3d at 214.

Nor do Plaintiffs' arguments persuade the Court otherwise. Plaintiffs rely on a pair of Illinois appellate court decisions—*Mauer v. Ruben* and *Lamet v. Levin*—to argue that Zoltek's malpractice theory is based on facts occurring in 1996, and thus that the statute of repose ran long ago. R. 88 at 5 (citing R. 83 at 5). Both cases are distinguishable.[8] In *Mauer*, defendants represented plaintiff in his divorce and prepared a marital settlement agreement that became part of the judgment for dissolution of marriage. 926 N.E.2d at 951. When plaintiff later discovered that the agreement was defective, defendants attempted to file a post-judgment motion to correct it, before subsequently withdrawing the motion some years later and without plaintiff's consent. *Id.* at 951-52. The court concluded that the judgment for dissolution of marriage started the statute of repose period notwithstanding the defendants' ongoing duty to correct their error, because it was a "final judgment" and "the alleged damage to Mauer's monetary interests was already complete" at that time. *Id.* at 958-59. Thus, the injury was not "cumulative or aggregate in nature, so

---

because the Court will allow the Counterclaim to proceed in any event, it will not address that theory here.

[8] Plaintiffs also fail to describe for the Court whether and how the differing pleading standards in Illinois state court might affect the analysis of those cases here.

as to trigger the application of the continuing violation doctrine"; instead, any injury could "be traced to the entry of that judgment." *Id.* at 957.

Here, in contrast, there is no single date on which the Court can be certain the injury arose. Instead, as noted, Zoltek's allegations that Plaintiffs' actions caused delayed settlement and payment of "excessive and unnecessary legal fees and expenses" may fall directly within the kind of "cumulative or aggregate" injury that Illinois courts have identified as a possibility but have yet to have the opportunity to confront. R. 243 ¶¶ 126, 135. Additionally, unlike in *Mauer*, Zoltek's claims are based on ongoing actions by Plaintiffs leading up to—not following—the eventual resolution of the litigation at issue. And there can be no dispute that the complexity of the issues and of the litigation giving rise to the malpractice action here far outweighs that before the court in *Mauer* in any event.

Plaintiffs' reliance on *Lamet* also is misplaced. There, plaintiff alleged that his lawyer knew or reasonably should have known when first retained in 1994 that there were "no legitimate defenses to his landlord's action to collect unpaid rent." 39 N.E.3d at 141. The court held that because his lawyer's failure to advise plaintiff of this in 1994 was the basis for plaintiff's suit, the statute of repose began then and his malpractice lawsuit, filed 17 years later, was thus untimely. *Id.*

Unlike in *Lamet*, Zoltek's Counterclaim does not and likely could not credibly allege that Plaintiffs knew or reasonably should have known from day one of the lengthy and complex patent litigation that Zoltek's infringement theory was devoid of merit. And again, the injury and conduct complained of are far more complex here.

In sum, Zoltek enumerates specifics acts by Plaintiffs, some of which fall within the 6-year period immediately prior to the filing of Zoltek's Counterclaim. Zoltek's theory appears to be that these actions, taken together, delayed and weakened its settlement position. At no point does the Counterclaim suggest that "the alleged damage to Zoltek's monetary interests was [ ] complete" as of some specified date. *Mauer*, 926 N.E.2d at 958-59. This is enough to survive Plaintiffs' motion to dismiss.

### c. Equitable estoppel and fraudulent concealment

In addition to contending that neither the statute of limitations nor the statute of repose bar its claims, Zoltek argues that even if one or both otherwise would, the doctrine of equitable estoppel doctrine would save them, because Plaintiffs had been concealing from it its "lack[ of] an actionable infringement theory as well as any evidence upon which to base infringement." R. 243.

While Zoltek does not invoke the fraudulent concealment statute by name, 735 ILCS 5/13-2015, Zoltek cites to *Sanders*—which relied upon it—in support of its contention that Plaintiffs' alleged concealment of "evidence from it that would have led to discovery of [its] malpractice claim earlier" is another basis to deny Plaintiffs' motion to dismiss.[9] R. 83 at 15. The "principles behind the [doctrine of equitable estoppel and the fraudulent concealment statute] are substantively the same." *Memorylink Corp.*, 2010 WL 11534462, at *5 (quoting *Turner v. Nama*, 689 N.E.2d

---

[9] The fraudulent concealment statute provides: "If a person liable to an action fraudulently conceals the cause of action from the knowledge of the person entitled thereto, the action may be commenced at any time within 5 years after the person entitled to bring the same discovers that he or she has such cause of action, and not afterwards." 735 ILCS 5/13-2015.

303, 308 (Ill. App. Ct. 1997)); *see also Mauer*, 926 N.E.2d at 648 ("The common-law doctrine of equitable estoppel, as applied in the context of the statute of repose, parallels the fraudulent concealment statute."). To establish that either applies, generally, a party must show that the other "said or did something to lull or induce [it] to delay the filing of [its] claim" until after the limitations or repose period ran. *Memorylink Corp.*, 2010 WL 11534462, at *5 (quoting *Wolf v. Bueser*, 664 N.E.2d 197, 205 (Ill. App. Ct. 1996)). That is, the plaintiff must allege "affirmative acts by the defendant that are designed to prevent the discovery of the action." *Lamet*, 39 N.E.3d at 143 (citing *Clay v. Kuhl*, 727 N.E.2d 217 (Ill. 2000)). But the fraudulent concealment statute can be invoked when an attorney—as a fiduciary—merely fails in its duty "to disclose material facts concerning the existence of a cause of action," and thus an attorney need not induce a client not to sue through acts or representations for a plaintiff to invoke the statute. *DeLuna*, 223 Ill.2d at 77-80.

In *Sanders*, the court found plaintiffs' "allegations that Defendants concealed their true intentions from Plaintiffs and that Defendants worked to hide their wrongful deeds" sufficient to deny the motion to dismiss on statute of limitations or statute of repose grounds. 2016 WL 4009941, at *9. Similarly, Zoltek alleges on information and belief that Plaintiffs learned long before their termination in 2016 that Zoltek lacked evidence of infringement and that their infringement theory lacked merit, and yet concealed this from Zoltek. R. 83 at 13; R. 243 ¶¶ 85-87. Accordingly, discovery may also reveal a basis for the Counterclaim to proceed even if the statutes of limitation or repose otherwise would bar it.

### C.     Summary

In sum, the Court finds ample reason to dismiss Count I of Zoltek's Counterclaim. With regard to Counts II and III, however, while it is possible that discovery may reveal that Plaintiffs' complained-of conduct all related to a single, negligent decision made years prior triggering the statute of repose, or that Zoltek had reason to know of Plaintiffs' alleged malpractice long ago triggering the statute of limitations, the Court declines to dismiss Counts II or III on either basis at this time. If appropriate, Plaintiffs may raise these matters again on summary judgment or at trial.

## II.     Rumy's Motion to Dismiss the Claims Against Him

In his motion to dismiss the claims against him in the Second Amended Complaint, Rumy again argues that the Court lacks personal jurisdiction over him. *See generally* R. 239. Plaintiffs contend as to their *quantum meruit* claim that the "hundreds of emails" Rumy sent and "(likely over a dozen) telephone calls" Rumy made to them in Illinois concerning their 20-year representation of Zoltek establish the Court's jurisdiction over Rumy. Although styled as a motion to dismiss for lack of personal jurisdiction, Rumy's argument reads as a motion to dismiss for failure to state a claim. Specifically, Rumy contends that the *quantum meruit* claim against him should be dismissed because there has been no showing that Rumy and Plaintiffs enjoyed a personal attorney-client relationship pursuant to which they may seek relief directly from him, as opposed to Zoltek.

As to the tortious interference claim, Monco contends that the same emails and telephone calls that allegedly establish this Court's jurisdiction over Rumy on the

*quantum meruit* claim support jurisdiction over Rumy there. Monco further alleges that Rumy waived his right to contest jurisdiction as to the tortious interference claim in any event because he signed the April 1996 retainer agreement containing a forum selection clause, and was so "closely related" to the dispute regarding fees that it was "foreseeable" that he would be haled into this Court. Rumy disagrees with both alleged bases for jurisdiction. First, Rumy argues that the communications directed to Monco in Illinois are not part of the actions alleged to constitute tortious interference. Second, Rumy argues both that he meets none of the special circumstances in which it is appropriate to bind a non-signatory to a forum selection clause, and also that the clause does not extend to the tortious interference claim in any event. The Court will address each claim in turn.

### A. Standard

"A complaint need not include facts alleging personal jurisdiction. However, once the defendant moves to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating the existence of jurisdiction." *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). When the court rules on the motion without a hearing, the plaintiff need only establish a *prima facie* case of personal jurisdiction. *Id.* The court reads "the complaint liberally, in its entirety, and with every inference drawn in favor" of the plaintiff to determine whether it has set forth a *prima facie* case for personal jurisdiction. *Cent. States, Se. & Sw. Areas Pension Fund v. Phencorp Reinsurance Co.*, 440 F.3d 870, 877-78 (7th Cir. 2006). "[O]nce the defendant has submitted affidavits or other evidence in opposition to the

exercise of jurisdiction, the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction." *Purdue*, 338 F.3d at 783.

## B.    Analysis of Claims Against Rumy

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Walden*, 571 U.S. at 283 (quoting *Daimler AG v. Bauman*, 571 U.S. 117 (2014)). The Illinois long-arm statute requires nothing more than the standard for federal due process: that the defendant have sufficient contacts with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Brook v. McCormley*, 873 F.3d 549, 552 (7th Cir. 2017) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

Personal jurisdiction can arise by way of: (1) "general jurisdiction (*i.e.*, continuous and systematic contacts with Illinois)"; (2) "specific jurisdiction (*i.e.*, sufficient minimum purposeful contacts with Illinois and the dispute arose out of those contacts)"; or (3) waiver, including when the agreement out of which a dispute arises contains a forum selection clause and the defendant is either party to that agreement or "so closely related to the dispute" that it is "bound by the forum selection clause" even though it did not sign the agreement. *Solargenix Energy, LLC v. Acciona, S.A.*, 17 N.E.3d 171, 182 (Ill. App. Ct. 2014); *accord Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985) ("because the personal jurisdiction requirement is a waivable right, there are a variety of legal arrangements by which a litigant may give express or implied consent to the personal jurisdiction of the court," including based on a freely negotiated forum selection clause). Plaintiffs have not asserted that this

Court may exercise general jurisdiction over Rumy, so this Court considers only specific jurisdiction over each of the claims against Rumy, and whether Rumy has waived his right to contest the Court's personal jurisdiction over him.

### 1. *Quantum Meruit* Claim

As explained, Plaintiffs allege that this Court has personal jurisdiction over Rumy as to their *quantum meruit* claim because Rumy directed hundreds of emails to Plaintiffs in Illinois and "likely" placed over a dozen telephone calls to them. R. 217 ¶ 101; R. 247 at 4-5. Plaintiffs further allege that in many cases these emails and calls concerned Rumy's attempts to reengage or keep Plaintiffs as counsel for Zoltek, and in some cases concerned how and whether Plaintiffs would be paid for their representation of Zoltek. R. 247 at 4-5. Plaintiffs contend that this "Illinois-directed conduct conferred specific jurisdiction over Rumy without regard to the forum selection clause" discussed below.[10] R. 247 at 4; R. 217 ¶¶ 54, 101, 103-105.

Specific jurisdiction grows out of "the relationship among the defendant, the forum, and the litigation." *Walden,* 571 U.S. at 284. It requires that "(1) the defendant [] purposefully availed himself of the privilege of conducting business in the forum state or purposefully directed his activities at the state; (2) the alleged injury must

---

[10] Unlike Monco's tortious interference claim (discussed below), Plaintiffs do not suggest that the forum selection clause could support this Court's jurisdiction over Rumy with respect to the *quantum meruit* claim. Nor could they. As noted, *Vance v. Gallagher*, 280 F. App'x 533 (7th Cir. 2008) provides that under Illinois law, when a client terminates an attorney, any written contract between them becomes inoperative, and the attorney may recover fees only "under the equitable theory of *quantum meruit*;" accordingly, any reliance on a forum selection clause in a fee agreement is "misplaced" for that purpose. *Id.* at 537.

have arisen from the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with traditional notions of fair play and substantial justice." *Felland v. Clifton*, 682 F.3d 665, 673 (7th Cir. 2012). "[A] defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." *Walden*, 571 U.S. at 286. And "[t]he proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Walden*, 571 U.S. at 290.

Here, at first blush, the Second Amended Complaint seems to establish that Rumy's communications directed to Plaintiffs in Illinois "connect[ed] him to [Illinois] in a meaningful way" with regard to Plaintiffs' *quantum meruit* claim. *Walden*, 571 U.S. at 290. "To recover under a *quantum meruit* theory, the plaintiff must prove that: (1) he performed a service to benefit the defendant, (2) he did not perform this service gratuitously, (3) [the] defendant accepted this service, and (4) no contract existed to prescribe payment for this service." *Bernstein & Grazian, P.C. v. Grazian & Volpe, P.C.*, 931 N.E.2d 810, 825-26 (Ill. App. Ct. 2010). Plaintiffs argue that through Rumy's email and telephone communications Rumy personally "reach[ed] into Chicago to re-engage Plaintiffs as lead counsel" in 2011, and also informed Plaintiffs in 2014 that Zoltek would not honor its payment obligation and they would have to handle the appeal on their own dime. R. 247 at 4-5. Plaintiffs contend these actions directly underlie their *quantum meruit* claim for fees. R. 247 at 4-5. Plaintiffs also point to Monco's declaration (attached to its response brief) to demonstrate that the "overwhelming amount of Plaintiffs' work on the case—which directly benefitted

Rumy—was performed in Chicago," and also to support their contention that Monco and Mortimer were reengaged in the Stealth litigation as a direct result of Rumy reaching out to them by telephone and letter. *Id.* at 5; R. 247-1 at 2-3.[11]

But the Court agrees with Rumy that at its core, and even assuming the emails and telephone calls constitute adequate contacts with Illinois, the issue is whether Rumy can *personally* be haled into court in Illinois on a claim for alleged attorneys fees when there has been no credible allegation that Rumy sought, let alone obtained, an attorney-client relationship with Plaintiffs separate from the one he sought and obtained on behalf of Zoltek.[12] Without such a relationship, Rumy contends he could not personally avail himself of the privilege of doing business in Illinois. R. 249 at 4-5. Plaintiffs also have not alleged that they performed legal services for the purpose of specifically benefitting Rumy as opposed to Zoltek, and cite no case in which "a

___

[11] Although the Second Amended Complaint does not allege that Rumy traveled to Chicago, it need not, given the numerous emails and telephone calls placed by Rumy regarding the Stealth litigation, and particularly those concerning the terms of Plaintiffs' engagement, and the payment (or nonpayment) by Rumy under those terms. *See Pentwater Equity Opportunities Master Fund, Ltd. v. Baker*, 2016 WL 454342, at *7 (N.D. Ill. Feb. 5, 2016) ("The fact that [defendant] attorneys never travelled to Illinois as part of the transaction is not dispositive given the extensive phone and email communications between [defendant and plaintiff] representatives in Illinois."); *compare Walden*, 571 U.S. at 289 ("Petitioner never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada. In short, when viewed through the proper lens—whether the *defendant's* actions connect him to the *forum*—petitioner formed no jurisdictionally relevant contacts with Nevada.").

[12] While Rumy did not address the emails and telephone calls in his motion, the Court assumes Rumy did not realize that Plaintiffs were asserting specific jurisdiction based on Rumy's telephone and email communications to Plaintiffs in Illinois. As noted, the Second Amended Complaint's "Jurisdiction and Venue" section describes the Court's jurisdiction over Rumy based only on the forum selection clause discussed further below. *See* R. 217 ¶¶ 13-14.

defendant purposely availed herself of the benefit of doing business in a forum by directing work for another party." *Id.* at 4-5. The sole case Plaintiffs *do* cite to support jurisdiction over the *quantum meruit* claim merely states that contact must flow from the defendant to the plaintiff for jurisdiction to lie. *See Brook*, 873 F.3d 549 (no jurisdiction where defendants "never sought out nor conducted business in Illinois, rather [plaintiff] sought out legal services from [defendants]"). Without a personal attorney-client relationship, the Court is hard-pressed to conclude that Plaintiffs have stated a plausible claim for relief against Rumy on a *quantum meruit* basis. However, because the parties have not briefed the issue, the Court declines to dismiss Plaintiffs' claim on this ground at this stage. If Rumy believes he has a credible basis on which to do so, he may file a separate motion to dismiss Plaintiffs' *quantum meruit* claim against him under Rule 12(b)(6) within fourteen days of this ruling. The Court will set an expedited briefing schedule on any such motion.

### 2. Tortious Interference Claim

Plaintiffs contend that the Court also has personal jurisdiction over Monco's tortious interference claim against Rumy both because of the communications Rumy directed to him in Chicago and because Rumy, as an officer of Zoltek, signed retainer agreements containing forum selection clauses and thus waived the right to contest jurisdiction. *See generally* R. 247. But Rumy argues that the communications Monco relies upon to establish personal jurisdiction were not "case-related" contacts, and that, as a non-party signatory to an agreement containing a forum selection clause, there was no waiver of jurisdiction simply because it was arguably "foreseeable" that

he might be haled to court based on his alleged close relationship with the dispute and parties. *See generally* R. 239; R. 249. He further argues that the contract was terminated and narrowly crafted and could not apply to the post-contractual dispute here in any event. R. 239 at 1. The Court will address first whether the Court has specific jurisdiction over Rumy, and then whether Rumy waived any right to contest jurisdiction by signing the agreements on Zoltek's behalf.

### a. Rumy's communications

The parties dispute whether Rumy's email and telephone communications directed to Plaintiffs in Illinois are sufficient to establish specific jurisdiction over Rumy. Where, as here, the plaintiff's claim is an intentional tort, the purposeful availment inquiry focuses on whether the conduct underlying the claims was purposely directed at the forum state. *Tamburo v. Dworkin*, 601 F.3d 693, 702 (7th Cir. 2010). In such cases, courts look to whether the plaintiff has shown "(1) intentional conduct (or 'intentional and allegedly tortious' conduct); (2) expressly aimed at the forum state; (3) with the defendant's knowledge that the effects would be felt—that is, the plaintiff would be injured—in the forum state." *Id.* at 703 (citing *Calder v. Jones*, 465 U.S. 783, 789-90 (1984)). This is known as the *Calder* test. The Supreme Court made clear in *Walden v. Fiore*, 571 U.S. 277 (2014) that to satisfy this test, the defendant's own allegedly tortious conduct must be directly connected to the forum state itself, and not just to the plaintiff who resides there. 571 U.S. at 286-88 ("A forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary

contacts with the forum."). Moreover, for jurisdiction to lie, "a defendant's contacts with the forum State [must] be directly related to the conduct pertaining to the claims asserted." *Brook v. McCormley*, 873 F.3d 549, 552 (7th Cir. 2017) (citing *Tamburo v. Dworkin*, 601 F.3d 693, 702 (7th Cir. 2010)). Put another way, "[s]pecific jurisdiction must rest on the *litigation-specific* conduct of the defendant in the proposed forum state" that relates to the "allegedly unlawful activity." *Advanced Tactical Ordinance Systems, LLC v. Real Action Paintball, Inc.*, 751 F.3d 796 (7th Cir. 2014) (emphasis in original).

Here, the first and third prongs of *Calder* are easily met. Monco alleges that Rumy's actions constituted intentional tortious interference with prospective economic advantage, satisfying the first prong. And as to the third prong, Monco is an Illinois citizen who is licensed, and practices, in Illinois, and thus any of his financial losses were presumably suffered in Illinois.

But *Calder's* second prong—whether Rumy's actions were expressly aimed at Illinois—is not met here. Indeed, while Monco alleges that Rumy tortiously interfered with his legal representation of Zoltek, all of the actions alleged to underlie the tortious interference took place in Missouri. Plaintiffs contend that Rumy sent emails to Monco in May and June 2016 regarding the transfer of the Stealth litigation to Rumy. *Id.* ¶ 114. Plaintiffs allege that after receiving and in response to these emails, Monco rendered advice to Zoltek which angered Rumy. *Id.* As a result, Plaintiffs allege that Rumy instructed Zoltek to fire Plaintiffs, telling Toray and Zoltek that the case was worthless and that it "is Zoltek's right to dismiss the [Plaintiffs] without

further liability." *Id.* ¶ 115. Plaintiffs allege that Rumy "even sent a draft letter terminating Plaintiffs for Zoltek's signature," and that Rumy "undertook these efforts to safeguard his planned personal stake in the case," and "insisted that Zoltek keep his personal interest in the case secret from Plaintiffs" when he negotiated an agreement between himself and Zoltek to split any settlement evenly between them. *Id.* ¶¶ 115-16. Monco argues that Rumy directed his actions at Illinois when he emailed Monco in Illinois to inform him of the case transfer. But these are not actions by which Rumy allegedly accomplished the tortious interference; they are simply part of the circumstances explaining Rumy's alleged motive. Monco also points out that he suffered injury in Illinois. But of course that is relevant to *Calder*'s third prong, not second.

Next, Plaintiffs rely on *Hugel* to argue that because a tortious interference claim arises from "the contractual relationship," Rumy's hundreds of emails and over a dozen phone calls to Plaintiffs in Illinois regarding Plaintiffs' representation in the Stealth litigation are sufficient to confer jurisdiction. R. 247 at 9 (citing *Hugel v. Corp. of Lloyd's*, 999 F.2d 206, 209 (7th Cir. 1993)). But *Hugel* did not present a personal jurisdiction issue. Instead, *Hugel* concerned whether a non-party to an agreement was "closely related" enough to the dispute such that it should be bound by the agreement's forum selection clause for purposes of venue. *See generally Hugel*, 999 F.2d 206.

Plaintiff also cites *Café Real Estate LLC v. VSP N. Am. LLC*, 262 F. Supp. 3d 637, 640 (N.D. Ill. 2017) for the general proposition that a defendant's "case-related

contacts with Illinois must be viewed in the aggregate." But again, neither *Hugel* nor *Café Real Estate LLC* compel the Court to find jurisdiction where Monco's claim is based on allegations that Rumy's actions were directed at *Zoltek in Missouri*, as opposed to *Monco in Illinois*. Moreover, the fact that Monco suffered injury in Illinois is of no moment, since the tortious conduct alleged plainly occurred in Missouri, even as it affected Monco in Illinois. *See Brook*, 873 F.3d at 552 ("The mere fact that a defendant's conduct affects a plaintiff with connections to the forum State is not sufficient to establish jurisdiction"); *Kraft Chem. Co. v. Salicylates and Chemicals Private Ltd, et al*, 2014 WL 11127924, at *2 (N.D. Ill. Oct. 28, 2014) ("the plaintiff's claimed injury is relevant only to the extent that it evinces a contact between the defendants and the forum state"). Accordingly, the Court agrees with Rumy that his May and June 2016 emails to Monco—which Plaintiffs allege caused Monco to render advice that angered Rumy and in turn caused Rumy to speak out against Monco to Zoltek in Missouri, and the only contacts even remotely related to the tortious interference claim—are "two causal links in the chain too many," and will not find jurisdiction on this basis. R. 249 at 8.

### b.     Forum selection clause

Plaintiffs also assert personal jurisdiction over Rumy based on implied waiver under the April 1996 retainer agreement and 2011 modification agreement forum selection clause. R. 247 at 7-8. "[T]he personal jurisdiction requirement is a waivable right, there are a variety of legal arrangements by which a litigant may give express or implied consent to the personal jurisdiction of the court." *Burger King Corp.*, 471

U.S. at 473 n.14. "For example, . . . parties frequently stipulate in advance to submit their controversies for resolution within a particular jurisdiction. Where such forum-selection provisions have been obtained through freely negotiated agreements and are not unreasonabe and unjust, their enforcement does not offend due process." *Id.*; *United Airlines, Inc. v. Zaman*, 152 F. Supp. 3d 1041, 1054 (N.D. Ill. 2015) ("Personal jurisdiction can be waived by the parties," including based on a forum selection clause). Under Illinois law, "forum selection clauses are presumed valid and enforceable, unless proven otherwise by the party contesting their application," and "have been held to apply not merely to contract claims involving the terms of the contract in which the clause appears, but also to other claims . . . connected to the contract, such as tort claims arising from the contract." *Solargenix Energy, LLC*, 17 N.E.3d at 182 .

> The forum selection clause at issue is broadly-worded to provide:

> both Zoltek and Monco/Mortimer shall submit themselves to the exclusive jurisdiction and venue of the Federal District Court for the Northern District of Illinois for resolution of any and all disputes under this Agreement.

R. 243-2 at 7. Rumy does not argue that the forum selection clause is unenforceable *per se*. Instead, the question is whether it is enforceable against him—a non-party signatory as a Zoltek officer—with respect to Monco's tortious interference claim.

Rumy makes two principle arguments as to why the forum selection clause does not bestow personal jurisdiction. First, Rumy argues that Plaintiffs "have not alleged the kind of corporate affiliation, mutuality, or special circumstances" necessary to "bind[ ] a 'closely related' party to a forum selection clause he did not

sign" for personal jurisdiction purposes. R. 240 at 3 (citing *Guaranteed Rate, Inc. v. Conn*, 264 F. Supp. 3d 909, 928 (N.D. Ill. 2017) and *Adams v. Raintree Vacation Exchange, LLC*, 702 F.3d 436, 439 (7th Cir. 2012)). Second, Rumy contends that the forum selection clause is not broad enough to cover Plaintiffs' tortious interference claim in any event. Plaintiffs, contend the opposite, arguing that Rumy "voluntarily" joined Zoltek in the Stealth litigation in which he was a "silent partner," and that he was a "third party beneficiary" to the retention agreements, and therefore that there's "ample reason" for him to be subject to the forum selection clause. R. 247 at 7-8.

Although the question as framed by the parties becomes what constitutes a "close[ ] relat[ionship] to the dispute" for purposes of satisfying the "closely related" test, *Solargenix*, 17 N.E.3d at 183, at the outset, the Court addresses a point that neither party discusses and proves dispositive. That is, where an officer signs an agreement on behalf of a corporation "and indicates next to his signature his corporate affiliation, then absent evidence of contrary intent in the document, the officer is not personally bound." *Sullivan v. Cox*, 78 F.3d 322, 326 (7th Cir. 1996) (quoting *Wottowa Ins. Agency, Inc. v. Bock*, 104 Ill.2d 311, 315-16 (Ill. 1984)); *First Classics, Inc. v Jack Lake Productions, Inc.*, 2018 WL 1427125, at *2 (N.D. Ill. Mar. 22, 2018) (same). Plaintiffs do not allege and the retention agreements do not indicate that Rumy signed them personally. Rather, Rumy signed them in his representative capacity on behalf of Zoltek. Nor do the agreements mention Rumy personally. Instead, the agreements reference only Zoltek. Thus, under this basic principle, Zoltek is bound by the forum selection clause and therefore subject to this Court's

personal jurisdiction because of it, but Rumy is not. *See Patriot Resource Partners II, LLC v. Service Disabled Veterans Business Assocs., Inc.*, 2008 WL 4534017, at *6 (N.D. Ill. Oct. 3, 2008) (officer did not waive personal jurisdiction by signing an agreement containing a forum selection clause where he signed it in his representative capacity on behalf of corporation, and agreement did not mention him personally); *see also G2 Enterprises, LLC v. Nee*, 2006 WL 1647518, at *3 (N.D. Ill. June 7, 2006) (officer did not waive personal jurisdiction by signing contract containing forum selection clause where he signed in his official capacity and contract did not mention him personally); *First Classics, Inc.*, 2018 WL 1427125 at *2 ("The Court is not convinced that [officer defendant] was acting outside of his capacity as president when he transacted with First Classics and thus, it finds that he should not be bound by the forum selection clause personally.").

Courts have recognized an exception to this rule where the individual is an alter ego of the corporation, and will pierce the corporate veil to hold the individual liable. *Kaeser & Blair, Inc. v. Willens*, 845 F. Supp. 1228, 1234 (N.D. Ill. 1993). However, to invoke the exception, the plaintiff must show "such unity of interest and ownership [between the individual defendant and the corporation] that the separate personalities of the corporation and the individual no longer exist . . . and the circumstances [are] such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *Id.* (quoting *Van Dorn Co. v. Future Chemical and Oil Corp.*, 753 F.2d 565, 569-70 (7th Cir. 1985)). This is a high standard, and the Court finds that Plaintiffs—even as they allege that Rumy was the

founder and largest shareholder at 18% when he signed the retention agreements on behalf of Zoltek and had influence over both Zoltek's sale and Plaintiffs' termination—have not alleged sufficient facts to invoke the exception.

The parties' analysis of the "closely related" test does not change the result. Both Plaintiffs and Rumy cite to the Seventh Circuit decision in *Adams v. Raintree Vacation Exchange, LLC*, 702 F.3d 436 (7th Cir. 2012), and this Court's decision in *Guaranteed Rate, Inc. v. Conn*, 264 F. Supp. 3d 909 (N.D. Ill. 2017), in support of their respective positions. The court in *Adams* applied the "closely related" test in the venue context, noting that the standard is "vague," yet "decompos[ing]" it into the principles of "affiliation" and "mutuality," either of which allow a nonsignatory party to invoke or be bound by (as applicable) a forum selection clause. 702 F.3d at 439. "Affiliation" applies:

> when a subsidiary is a party to a contract that contains a forum selection clause and the other party to the contract sues the parent under the contract. The parent should be allowed to invoke the clause and thus insist that the suit be litigated in the same court which, pursuant to the clause, its subsidiary is being sued.

*Id.* at 439-40. There can be no allegation that this concept allows jurisdiction here; Rumy is an officer, not a subsidiary, of Zoltek.

Next, the *Adams* court explained that the principle of "mutuality" allows a plaintiff to enforce the clause in the same situations the defendant is able to invoke them. *See id.* at 442-43. Otherwise, defendants "would have their choice of forum and applicable law, but Plaintiffs would be bound to litigate in Illinois under Illinois law."

*Walls v. VRE*, 344 F. Supp. 3d 932, 946 (N.D. Ill. 2018). This "mutuality" concept also does not apply.

This Court explained in *Guaranteed Rate, Inc.* that there may be "other specified circumstances" beyond principles of corporate affiliation and mutuality under which non-signatories may be bound by forum selection clauses, "at least insofar as venue is concerned," but expressly warned that the personal jurisdiction context implicates an additional set of considerations.[13] 264 F. Supp. 3d at 927. Namely: concerning due process. *Id.* at 926. Accordingly, the Court explained its "serious concerns over whether it would be '[ ]reasonable and [ ]just'" under *Burger King Corp.*, 471 U.S. at 473 n. 14, "to apply a 'close relationship' test relying on 'foreseeability' to find implied consent to personal jurisdiction." *Id.* Indeed, "[i]f foreseeability cannot establish minimum contacts, it should not be a sufficient basis for finding a waiver or implied consent either," since a court holding a "nonsignatory is bound by the forum selection clause is really applying a concept more akin to forfeiture or estoppel." *Id.* Ultimately, for these reasons, the Court declined to find jurisdiction over an out-of-state new employer under the "closely-related" party doctrine based on a contract to which it was not a party where it did not "voluntarily join" the contracting employee in litigation. *Id.* While the Court made clear that "[n]othing about [its] discussion [wa]s meant to call into question the holdings in

_____

[13] Examples cited include *Frietsch v. Refco, Inc.*, 56 F.3d 825, 828 (7th Cir. 1995) (cat's paw); *Fcstone, LLC v. Adams*, 2011 WL 43080 (N.D. Ill. Jan. 6, 2011) (husband/wife scenario); *Am. Patriot Ins. Agency, Inc. v. Mut. Risk Mgmt., Ltd.*, 364 F.3d 884, 889 (7th Cir. 2004) (parties to other agreements that together with the contract containing the forum selection clause constitute a cohesive contractual scheme).

*Adams* and similar cases" "based on principles, among other things, of . . . corporate affiliation," it held that those cases "simply [we]re not applicable" because there was "no evidence of corporate affiliation, mutuality, or any of the other types of relationships discussed in the case law" for enforcing forum selection clauses against non-signatories. *Id.*

Here, while Plaintiffs alleged that Rumy was heavily involved in the Stealth litigation and engaging and managing Plaintiffs' work on that same litigation, and that he signed the fee agreements with Plaintiffs on Zoltek's behalf, Plaintiffs have not alleged facts tending to show the kind of special relationship required to find a waiver of jurisdiction. Plaintiffs contend without more that Rumy was a "silent partner" with Zoltek in the Stealth litigation before Zoltek fired Plaintiffs, and that Rumy "voluntarily joined" Zoltek in the litigation, and thus is "closely related" enough to the agreement and dispute to have waived jurisdiction on that ground under *Guaranteed Rate, Inc.*. R. 247 at 8 (citing *Guaranteed Rate, Inc.*, 246 F. Supp. 3d at 927). But this Court made clear in *Guaranteed Rate, Inc.* that the "closely related" theory is limited. The Court certainly did not hold, and will not hold here, that an officer who signed an agreement in his representative capacity and assisted in litigation for the corporation necessarily subjected himself to jurisdiction. Finally, Plaintiffs' argument that Rumy was a third party beneficiary to the retention agreements and that he should be bound for that reason alone similarly fails. R. 247 at 8 ("The non-signatory need not also be deemed a third party beneficiary of the contract in order for a court to find that the forum selection clause applies to it,

although third party beneficiary status would, by definition, satisfy the closely related and foreseeability requirements" (quoting *Solargenix*, 17 N.E.3d at 183)). While true that Rumy may have benefitted from Plaintiffs' work in the Stealth litigation through his status as a Zoltek officer and shareholder, he is not a "third party beneficiary" as contemplated by the court in *Solargenix*. To hold otherwise would severely undercut the rule that officers generally are not bound by—including for personal jurisdiction purposes—contracts signed in their representative capacities. *Sullivan*, 78 F.3d at 326.

Simply put, Plaintiffs fail to cite a single case holding that an officer who signed an agreement containing a forum selection clause in his capacity as a corporate representative impliedly consented to personal jurisdiction through that clause. Thus, for all of Plaintiffs' allegations that Rumy's actions were motivated by personal interest and spite, Plaintiffs fail to make a credible case for personal jurisdiction over him in this Court. Despite Plaintiffs' perfunctory arguments to the contrary, the Court agrees with Rumy that while it may have been "foreseeable" to Rumy that he was at risk of being sued in Illinois when he "knowingly allow[ed himself] to become embroiled in a dispute related to a contract with a forum selection clause," this simply does not mean he "*intended to relinquish* [his] constitutional right to be free from suit except in a forum with which [he] has minimum contacts." *Guaranteed Rate, Inc.*, 264 F. Supp. 3d at 926. Accordingly, Rumy is not subject to personal jurisdiction in Illinois based on the forum selection clauses in the retainer agreements to which he is not a party. To hold otherwise would call into question the basic principles of officer

liability. *See Playboy Enterprises Intern., Inc. v. Smaritian (Singapore) PTE Ltd.*, 908 F. Supp. 2d 730, 737 (N.D. Ill. 2011) (declining to allow plaintiff to "sidestep corporate veil piercing requirements" to establish personal jurisdiction over director through a forum selection clause "simply because [he was] closely related to the dispute").

Having determined that Rumy cannot be subject to jurisdiction based on the forum selection clause, the Court need not consider whether the forum selection clause is broad enough to include the tortious interference claim.

C.    **Summary**

Even as replead, the Second Amended Complaint still fails to establish this Court's jurisdiction over Rumy as to Monco's tortious interference claim. As noted, Rumy may file a separate motion to dismiss Plaintiffs' *quantum meruit* claim as to him under Rule 12(b)(6) if he believes he has a sufficient basis to do so.

\*    \*    \*    \*    \*

**CONCLUSION**

For the foregoing reasons, Plaintiff's motion to dismiss Zoltek's Counterclaim, R. 58, is granted in part and denied in part, and Rumy's motion to dismiss the claims against him, R. 239, is granted in part and denied in part.

ENTERED:

*Thomas M Durkin*

_____

Honorable Thomas M. Durkin
United States District Judge

Dated: February 27, 2019