# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DEAN A. MONCO; JOHN S. MORTIMER;　　)
WOOD, PHILLIPS, KATZ, CLARK &　　　　)
MORTIMER,　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)
　　　　　　Plaintiffs,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)　　No. 17 C 6882
　　　　　v.　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)　　Judge Thomas M. Durkin
ZOLTEK CORPORATION AND ZSOLT RUMY,　　)
　　　　　　　　　　　　　　　　　　　　　)
　　　　　　Defendants.　　　　　　　　　　)

## MEMORANDUM OPINION AND ORDER

Plaintiffs Dean A. Monco, John S. Mortimer, and Wood, Phillips, Katz, Clark, & Mortimer ("Wood Phillips") seek recovery of legal fees from defendants Zsolt Rumy and Zoltek Corporation under a *quantum meruit* theory for their representation of Zoltek in patent litigation spanning the course of 20 years. Currently before the Court are Rumy's motion to dismiss Plaintiffs' *quantum meruit* claim against him under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, R. 259, and Zoltek's motion for partial summary judgment on Plaintiffs Monco and Mortimer's *quantum meruit* claim against it for lack of standing and because they are not the real parties in interest under Federal Rule of Civil Procedure 17, R. 196. For the following reasons, the Court grants Rumy's motion to dismiss and denies Zoltek's motion for summary judgment.

Defendant Zoltek is a carbon fiber manufacturer. Defendant Rumy was the founder and majority shareholder of Zoltek until Toray Industries, Inc., an international Japanese corporation, acquired Zoltek in 2014.[2] Plaintiff Wood Phillips is a law firm, and plaintiffs Monco and Mortimer are attorneys who were partners or of counsel with Wood Phillips at all times relevant to this lawsuit.

In 1996, Zoltek hired Plaintiffs to represent it in litigation conducted in Washington, D.C. to enforce a Zoltek patent ("Stealth litigation"). That litigation lasted for 20 years. The work was done largely on a contingency basis under a series of agreements. The first retainer agreement was executed by Zoltek (through Rumy) and Wood Phillips in February 1996 ("February 1996 Agreement"). Then, in April 1996, Zoltek (through Rumy) executed a second retainer agreement directly with Wood Phillips attorneys Monco and Mortimer ("April 1996 Agreement"). Plaintiffs maintain that the April 1996 Agreement displaced the February 1996 Agreement. Finally, in 2011, Monco, Mortimer and Zoltek (again, through Rumy) signed a modification to the April 1996 Agreement ("2011 Modification").

The Stealth litigation proceeded in and out of various stages of litigation through the years. Ultimately, following a three-day trial, the Court of Federal Claims held in March 2014 that Zoltek's patent was invalid. Thereafter, Rumy told

---

[1] Additional background facts are set forth in the Court's three previously issued opinions in this case. *See* R. 183; R. 221; R. 257.

[2] Toray Industries, Inc., a former defendant in this lawsuit, was terminated from the case through the Court's October 26, 2018 order granting its motion to dismiss under Federal Rule of Civil Procedure 12(b)(2). R. 221.

Monco and Mortimer that they would have to "handle the appeal on their own dime," because Zoltek would not pay. Monco and Mortimer went on to brief and argue the appeal before the Federal Circuit. R. ¶ 69.

Meanwhile, Toray purchased Zoltek in late 2014, and Zoltek started operating as its wholly-owned subsidiary. Plaintiffs allege that Toray acquired "all rights to the Zoltek Patent and any recovery from the lawsuit" in conjunction with the purchase. *Id.* ¶ 71. Then, in February 2016, the Federal Circuit reversed the Court of Federal Claims, holding that Zoltek's patent was not invalid. But the relationship between Zoltek and Monco and Mortimer deteriorated. During a July 2016 meeting, Zoltek's other outside counsel told Monco and Mortimer that the April 1996 Agreement was being terminated and proposed paying them an hourly rate for their work going forward. Rumy also allegedly made false statements about Monco and Mortimer to a Toray representative, and suggested that Monco and Mortimer's actions had jeopardized the case. *Id.* ¶¶ 102, 115. After the meeting, Zoltek terminated Monco and Mortimer as counsel, refusing to pay overdue bills, and substituted another firm as lead counsel in the Stealth litigation. A few weeks later, the Stealth litigation settled for $20 million. Plaintiffs did not recover anything from the settlement.

Plaintiffs filed this lawsuit in September 2017. R. 1. The Court entertained a variety of motions to dismiss, and twice allowed Plaintiffs to amend their complaint. Plaintiffs' operative complaint, the Second Amended Complaint ("SAC"), alleges that Zoltek accepted Plaintiffs' services throughout the difficult and lengthy Stealth litigation and that Plaintiffs deserve to recover for those services on a *quantum*

*meruit* basis (Count I), *Id.* ¶¶ 88-97. The SAC also states a *quantum meruit* claim by all Plaintiffs against Rumy (Count II). *Id.* ¶¶ 98-109. There, Plaintiffs allege that while Rumy agreed to personally assume responsibility for directing the Stealth litigation on Zoltek's behalf and resolving Plaintiffs' claim for fees, he actually was motivated by his own interests, secured a substantial share of the settlement for himself, and has yet to pay Plaintiffs. *Id.* Monco also asserted a claim against Rumy for tortious interference with prospective economic advantage (Count III). *Id.* ¶¶ 110-120. For its part, Zoltek made counterclaims of professional negligence and breach of fiduciary duty, and seeking a declaratory judgment that the April 1996 Agreement and 2011 Modification between Monco, Mortimer and Zoltek are void. R. 243 at 45-46.

On February 27, 2019, the Court rejected Monco's claim against Rumy for tortious interference with prospective economic advantage (Count III) and Zoltek's counterclaim for declaratory judgment that the April 1996 Agreement and 2011 Modification are void (Count I of the Counterclaim). Therefore, only Plaintiffs' *quantum meruit* claims against Zoltek (Count I of the SAC) and Rumy (Count II of the SAC), and Zoltek's counterclaims against Plaintiffs for breach of fiduciary duty and negligence (Counts II and III of the Counterclaim) remain. R 257. In denying Rumy's motion to dismiss the *quantum meruit* claim against him under Rule 12(b)(2), the Court cautioned Plaintiffs that the viability of their claim turned on whether a personal attorney-client relationship existed between Plaintiffs and Rumy, as opposed to Plaintiffs and Zoltek. *Id.* at 30-31. The Court invited Rumy to file a

separate motion to dismiss under Rule 12(b)(6) on that basis if he believed he had a credible basis to do so, and Rumy did. *Id.* at 31; R. 259. The Court will address that motion first, and then turn to Zoltek's motion for partial summary judgment arguing that Monco and Mortimer lack standing to seek *quantum meruit* on an individual basis, and are not the real parties in interest for purposes of Federal Rule of Civil Procedure 17(a).

## ANALYSIS

### I.     Rumy's Motion to Dismiss

Rumy contends that the *quantum meruit* claim against him should be dismissed with prejudice because there has been no allegation that Rumy and Plaintiffs enjoyed a personal attorney-client relationship pursuant to which they may seek relief directly from him, as opposed to Zoltek. *See generally* R. 260; R. 280. In response, Plaintiffs argue that Rumy "made himself Plaintiffs' client for purposes of *quantum meruit*" when he "pressed Plaintiffs to take the [Stealth litigation] appeal on their own dime" to advance Rumy's "personal stake in the suit," which ultimately amounted to half of a $20 million judgment. R. 265.

#### A.     Standard

A Rule 12(b)(6) motion challenges the "sufficiency of the complaint." *Berger v. Nat. Collegiate Athletic Assoc.*, 843 F.3d 285, 289 (7th Cir. 2016). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-

harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 366 (7th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Tobey v. Chibucos*, 890 F.3d 634, 646 (7th Cir. 2018).

## B. Analysis of Rumy's 12(b)(6) Motion

To recover under a *quantum meruit* theory, Plaintiffs must prove that: (1) they performed a service to benefit Rumy, (2) they did not perform this service gratuitously, (3) Rumy accepted this service, and (4) no contract existed to prescribe payment for the service. *Bernstein & Grazian, P.C. v. Grazian & Volpe, P.C.*, 931 N.E.2d 810, 825-26 (Ill. App. Ct. 2010). But "[t]he right to attorney fees based on *quantum meruit* does not exist unless there is an underlying attorney-client relationship where the client expressly or impliedly agrees to pay fees." *In re Chicago Flood Litigation*, 682 N.E.2d 421, 427 (Ill. App. Ct. 1997); *see also Wildman, Harrold, Allen & Dixon v. Gaylord*, 740 N.E.2d 501, 509 (Ill. App. Ct. 2000) (prima facie case

for attorney's fees based on *quantum meruit* "includes proof of . . . the existence of an attorney-client relationship").

Plaintiffs argue—with minimal citation to the SAC—that the SAC sets forth the following theory, through which they state a *quantum meruit* claim against Rumy. In February 2014, Rumy sold Zoltek to Toray, which Plaintiffs allege "changed [Rumy's] relationship to Plaintiffs and to Zoltek." R. 265 at 1, 3. In negotiating that sale, Rumy represented to Toray that the Stealth litigation had zero value, which Plaintiffs allege was part of Rumy's plan to obtain personal ownership of all or a significant share of the litigation. *Id.* at 3 (citing R. 217 ¶ 102). Then, having lost the Stealth litigation and the Court of Federal Claims having invalidated Zoltek's patent in March 2014, Toray wanted Zoltek out of the litigation, and Rumy wanted the case "for himself." *Id.* at 2, 3. Rumy needed an attorney to assist with the appeal "or he would certainly get nothing," since the stock sale to Toray divested Rumy's large stake in Zoltek, "separating him from any benefit Zoltek might get from the case." *Id.* at 3, 4. But Plaintiffs contend that Rumy knew Toray would not pay for an appeal and that Monco and Mortimer would likely be hesitant to handle it because Zoltek had not paid recent invoices. *Id.* at 2, 4. According to Plaintiffs, Rumy also knew that if he personally hired a lawyer, he would personally be on the hook for payment. So in 2014 he convinced Plaintiffs to take the appeal "on their own dime" despite also informing Plaintiffs that "Zoltek would not honor its payment obligations" under the 2011 Modification. *Id.* at 2, 4 (citing R. 217 ¶ 103). The appeal was successful, and in December 2016 and with no further litigation, the parties tentatively agreed to a $20

million judgment. *Id.* at 2; R. 217 ¶ 86. That same month, Rumy signed an agreement with Zoltek formalizing an oral agreement they had reached in June 2016 pursuant to which Rumy recovered half of the judgment and would pay half of the fees. *Id.* at 2; R. 217 ¶¶ 105-07. Accordingly, Plaintiffs argue that Rumy owes *quantum meruit* because he "demanded that Plaintiffs pursue the successful appeal" in 2014 "in pursuit of [his] own personal stake in the suit" and acted in that capacity "separate from Zoltek, through 2016." R. 265 at 2, 4.

Rumy argues that not only do Plaintiffs fail to plead this theory in the SAC, but also that even if they had, it still would not state a *quantum meruit* claim. More specifically, Rumy contends that the SAC fails to plead, as it must, that there was a meeting of the minds between Plaintiffs and Rumy regarding any representation of Rumy individually, and in fact states the opposite, making clear Plaintiffs represent Zoltek, not Rumy. *See generally* R. 260; R. 280. Rumy argues further that Plaintiffs have not plead that there was a direct benefit to Rumy because of Plaintiffs' work. *Id.*

The Court agrees that the SAC does not plead the theory Plaintiffs now allege, but that even if it did, it still would fail. Rumy is correct that Plaintiffs admit in the SAC that they represented Zoltek, not Rumy. R. 217 ¶ 76 (SAC alleging that Monco and Mortimer represented Zoltek at the July 2016 meeting and Rumy was represented by separate counsel). Other documents on the docket in this matter are in accord. *See, e.g.*, R. 190 at 3 (Monco's discovery motion stating "While [Rumy] may have invited an attorney-client relationship with Plaintiffs, the subject matter posed a conflict with the interests of Plaintiffs' *actual* client, Zoltek") (emphasis added); R.

213 at 4 (Magistrate Judge Cole's November 10, 2018 opinion on the same discovery motion noting that "as the plaintiffs concede, there was no dual representation" of Zoltek and Rumy). Plaintiffs statements prevent them from claiming a personal attorney-client relationship with Rumy. *See Keller v. United States*, 58 F.3d 1194, 1198 n. 8 (7th Cir. 1995) ("Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them. They may not be controverted at trial or on appeal."); *see also Higgins v. Mississippi*, 217 F.3d 951, 955 (7th Cir. 2000) ("a judicial admission is in the nature of a waiver").

Without a personal attorney-client relationship, Plaintiffs cannot state a plausible claim for *quantum meruit* relief against Rumy. *See Rubin and Norris, LLC, v. Panzarella*, 51 N.E.3d 879, 891 (Ill. App. Ct. 2016) ("The attorney-client relationship [including for purposes of a *quantum meruit* claim] is a voluntary, contractual relationship that requires the consent of *both* the attorney and client." (quoting *In re Chicago Flood Litigation*, 289 Ill. App. 3d at 941 (emphasis added))).

And while Plaintiffs attempt to persuade the Court that Rumy benefitted personally from Plaintiffs' work and that they state a claim because of it, the Court is unconvinced. Just because Plaintiffs work *benefited* Rumy does not mean they did the work *to* benefit Rumy. Plaintiffs have neither alleged nor even argued that they performed services specifically for Rumy's benefit. Nor could they; Rumy's Stealth Litigation recovery was through his separate arrangement with *Zoltek*, not Plaintiffs. This indirect benefit to Rumy is not enough. *See Friedman & Friedman, Ltd. v. Basic*,

2012 WL 6962866, at *6 (Ill. App. Ct. Nov. 30, 2012) (discussing *In re Chicago Flood Litigation*, 289 Ill. App. 3d 937 (Ill. App. Ct. 1997), holding class counsel was not entitled to attorney fees under *quantum meruit* theory in part because "class counsel did not argue that they did work solely for the benefit of the opt-out plaintiffs."); *see also In re Chicago Flood Lit.*, 289 Ill. App. 3d at 945 (plaintiff could not recover under *quantum meruit* theory from opt-out plaintiffs who retained their own attorneys because there was no attorney-client relationship; that class counsel may have conferred some benefit on opt-out plaintiffs "does not automatically entitle counsel to fees."); *Bernstein and Grazian, P.C.*, 931 N.E.2d at 826 ("The mere fact that a person benefits another is not of itself sufficient to require the other to make restitution" when no personal attorney-client relationship exists (quoting *Hayes Mech., Inc. v. First Indus., L.P.*, 812 N.E.2d 419 (Ill. App. Ct. 2004))).

Plaintiffs contend that the unpublished opinion in *Friedman & Friedman, Ltd. v. Basic*, 2012 WL 6962866 (Ill. App. Ct. Nov. 30, 2012) is "the Illinois decision most analogous to the facts here," and compels the Court to deny Rumy's motion. R. 265 at 6. It is true that in *Friedman*, as here, a law firm plaintiff sought recovery under a *quantum meruit* theory from a corporate employer and corporate employee for patent work. 2012 WL 6962866, at *1. But the similarities end there. The law firm's work in *Friedman* consisted of filing and maintaining patents *in the corporate employee's name*, and that work continued after the corporate employee transferred his personal rights, title and interest in certain existing and future patents to another company as part of a consulting agreement he executed with it. While that company initially

paid for plaintiff's continued work, it ultimately stopped. *Id.* The law firm filed suit to recover fees, naming the corporate employee and (original) corporate employer. Both defendants contended that any right to recovery plaintiff had was against the new company alone because there no longer existed an attorney-client relationship between them. But in affirming the award for plaintiff, the Illinois appellate court reasoned that the corporate employee continued to request work by the plaintiff law firm, not all of the patents fell within the reassignment he made through his consulting agreement, and he assigned neither his obligations nor his liabilities under even those patents that did. *Id.* at 8.

While Rumy similarly directed Plaintiffs' work, unlike the employee-defendant in *Friedman* who had a direct interest in the patents filed in his name (and maintained his obligations and liabilities with respect to some patents, and all of his interests in others), Rumy had a mere hope of recovering from the Stealth litigation and *Zoltek's* patent through his separate arrangement with Zoltek unknowable to Plaintiffs. And more to the point, unlike Rumy, the corporate employee in *Friedman* had an attorney-client relationship with the plaintiff law firm—both personally, and through his company—and maintained that relationship throughout. *Id.* at *1, *2, *7. In contrast, Rumy's interest in the litigation was tied to his separate agreement with Zoltek, and his dealings with Plaintiffs originated solely from his role as a Zoltek officer. Indeed, Plaintiffs admit in their brief that Rumy "was never up front with Monco about his deal with Toray," "was not fully forthcoming about the details of his

separate stake in the case," and that his "intentions were only partially disclosed to Monco." R. 265 at 2, 4, 7. *Friedman* does not change the result here.

Finally, Plaintiffs seek leave to amend should the Court grant Rumy's motion. But Plaintiffs fail to demonstrate that any amendment would cure the deficiencies apparent: there simply is no basis upon which to hold Rumy liable to Plaintiffs even if Plaintiffs' characterization of the SAC were correct. Accordingly, the Court grants Rumy's motion to dismiss—Rumy's third such motion—with prejudice.

## II.  Zoltek's Motion for Partial Summary Judgment

Zoltek argues that individual plaintiffs Monco and Mortimer lack standing as to their *quantum meruit* claim against it and are not the real parties in interest under Federal Rule of Civil Procedure 17(a). The gist of Zoltek's argument is that Monco and Mortimer's rights are only derivative of Wood Phillips' as attorneys of that firm, and they thus have no separate right to proceed against Zoltek individually. Only Monco disagrees; indeed, in Mortimer and Wood Phillips' joint response to Zoltek's motion, filed separately from Monco's response, they concede that Mortimer lacks standing and that Wood Phillips—not the individual plaintiffs—is the real party in interest.[3] *See generally* R. 225. At its core, Monco's argument to the contrary stems from the fact that the most recent client engagement agreement and subsequent modification thereto named him (and Mortimer) as the exclusive recipients of any

_____

[3] However, Mortimer and Wood Phillips contend in the alternative that if the Court finds that Monco has standing, then it should conclude that Mortimer does also. R. 225 at 7.

contingency award, giving him (and Mortimer) the right to seek relief directly from Zoltek. *See generally* R. 230.

## A.    Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## B.    Relevant Facts

Unless otherwise noted, the following facts are undisputed or uncontroverted for purposes of resolving Zoltek's motion.[4] Wood Phillips is a legal partnership, the

---

[4] The briefing on Zoltek's motion is somewhat unorthodox. Only Monco contests the motion. He filed a response brief to that effect, along with a response to Zoltek's Rule 56.1 statement of undisputed material facts and a Rule 56.1 statement of additional facts. But plaintiffs Mortimer and Wood Phillips also jointly filed a response brief and prepared responses to Zoltek's Rule 56.1 statement, as well as their own separate Rule 56.1 statement of additional facts. Presumably because it is Zoltek's motion alone and notwithstanding their differing positions on Zoltek's arguments, Monco did not respond to Wood Phillips and Mortimer's (joint) Rule 56.1 statement of additional

operations of which are governed by a partnership agreement that is amended from time to time. ZSOF ¶¶ 11, 12.[5] At all times relevant to this lawsuit, Mortimer was a Wood Phillips partner, as was Monco until his transition to "of counsel" in 2010.[6] *Id.* ¶¶ 14-16.

***Retainer agreements.*** In February 1996, Zoltek and Wood Phillips (through Monco, Mortimer, and the chairman of Wood Phillips' executive committee) executed the February 1996 Agreement, a retainer agreement that included a contingency structure for Wood Phillips' representation of Zoltek in the Stealth litigation. *Id.* ¶ 7. A month later, Wood Phillips filed the Stealth litigation on Zoltek's behalf. *Id.* ¶ 8. Then, in April 1996, Zoltek executed the April 1996 Agreement, a new retainer agreement also based on a contingency structure, but this time signed by Monco and Mortimer individually, both of whom were Wood Phillips partners at the time and were identified as such therein. *Id.* ¶¶ 9, 14. According to Wood Phillips, this change was made because Wood Phillips "did not want responsibility to handle the litigation if Mortimer and Monco left the Firm during the [Stealth] litigation." R. 232, Ex. U at

---

facts, and nor did Wood Phillips and/or Mortimer respond to his. Accordingly, the facts outlined here are drawn primarily from Zoltek's 56.1 statements, Wood Phillips and Mortimer's and Monco's separate responses thereto, and Monco's additional statements of fact, including as responded to by Zoltek.

[5] For purposes of this opinion: "ZSOF" refers to R. 198, Zoltek's Rule 56.1 statement of material facts; "MRZSOF" refers to those portions of R. 231 that represent Monco's response to Zoltek's Rule 56.1 statement; "MSAF" refers to those portions of R. 231 that represent Monco's Rule 56.1 statement of additional facts; and "ZRMSAF" refers to R. 235, Zoltek's response to Monco's Rule 56.1 statement of additional facts.

[6] As of October 30, 2018, Monco left Wood Phillips. R. 232 ¶ 26.

2 (Wood Phillips' answer to Zoltek's interrogatories). A transmittal letter to Zoltek accompanying the new agreement explained:

> [T]he Agreement is now between Zoltek and us as individuals rather than between Zoltek and Wood, Phillips. This change was made for internal purposes within our firm.

ZSOF ¶ 10 and Ex. 1 at 1.

Section 2(a) of the April 1996 Agreement provided that MONCO/MORTIMER (instead of Wood Phillips, as under the February 1996 Agreement) would receive a percentage of the net recovery that varied depending on the stage of litigation at which the case was resolved. The provision did not mention Wood Phillips at all. R. 232, Ex. D at 2.

Section 5 concerned Zoltek's right to terminate the litigation and included an option for Monco and Mortimer to carry it on and obtain any recovery for themselves, stating:

> ZOLTEK may terminate any litigation undertaken under this Agreement at any time, in its sole discretion, upon giving thirty (30) days prior written notice to MONCO/MORTIMER. Within thirty days MONCO/MORTIMER shall have the right to carry on the litigation on ZOLTEK's behalf. MONCO/MORTIMER shall then be solely responsible for payment of all reasonable and necessary disbursements as set out in 2(b), above, and shall have exclusive right to make decisions regarding the conduct of any litigation and settlement thereof. Any recoveries in litigation carried on under this section shall be disbursed entirely to MONCO/MORTIMER. ZOLTEK shall provide whatever non-financial assistance MONCO/MORTIMER reasonably require to conclude this litigation.

ZSOF ¶ 40; R. 232, Ex. D at 6. This provision was not included in the February 1996 Agreement. *See generally* R. 232, Ex. S. The transmittal letter to Zoltek accompanying the April 1996 Agreement explained that this section:

pertains to the situation wherein Zoltek, for whatever reason, decides not to expend any further effort or monies in the litigation and to simply "pull the plug." This paragraph gives us the option to assume the responsibilities for representing Zoltek, and to have the right to any recovery received.

ZSOF ¶ 39.

Next, Section 6 of the April 1996 Agreement, entitled "Termination By Settlement," provided:

> Any litigation undertaken under this Agreement may be settled under terms mutually agreed to by MONCO/MORTIMER and ZOLTEK. No claim or other civil proceeding involving the PATENTS shall be brought or settled without the express written approval of ZOLTEK. In the event that MONCO/MORTIMER and ZOLTEK cannot agree to the terms of a settlement, the decision on the terms of a settlement shall be made by a third party selected by mutual agreement of MONCO/MORTIMER and ZOLTEK. The decision of that third party shall be final and, once made, unchallengeable by either party.

R. 232, Ex. D at 6. This provision was also new. *Compare* R. 232, Exs. D and S. Consistent with the terms of the February 1996 Agreement (except that it substituted "MONCO/MORTIMER" for "WOOD, PHILLIPS"), the April 1996 Agreement further provided that if terminated by Zoltek:

> MONCO/MORTIMER shall be entitled to receive from ZOLTEK no less than the reasonable value of its services performed on ZOLTEK's behalf up to the date of termination, to be paid from funds received by ZOLTEK upon completion or termination of the litigation.

R. 232, Ex. D at 5; R. 232, Ex. S at 5. The transmittal letter accompanying the April 1996 Agreement recommended that Zoltek:

> review this Retainer Agreement with your attorneys, and let us have your comments and input at your earliest convenience. If you have any questions regarding any matters in the enclosed Retainer Agreement, please contact us.

ZSOF, Ex. 1 at 2. Zoltek (through Rumy) signed the April 1996 Agreement without requesting any changes. MSAF ¶ 21.

Years later in October 2009, Rumy expressed dissatisfaction with the direction of the ongoing Stealth litigation, and engaged another firm as lead counsel. *Id.* ¶ 23. Monco and Mortimer withdrew their appearances in the lawsuit, but continued as support counsel until May 2011 when Rumy asked Monco and Mortimer to return as lead counsel. *Id.* ¶¶ 24, 25. After further discussions, Monco and Mortimer agreed and signed the 2011 Modification to the April 1996 Agreement, which set forth a reduced hourly rate in exchange for a reduction in percentage from any judgment or settlement in the Stealth Litigation as follows:

> MONCO/MORTIMER will be paid $200 per hour for their legal services. Associates of the Wood Phillips Law Firm working on the case will be bill [sic] at a rate of $200 per hour.
> …
>
> One hundred fifty percent (150%) of any attorneys' fees paid by ZOLTEK after October 1, 2011 to MONCO/MORTIMER and the Wood, Phillips Firm shall be deducted off the top of any recovery and credited to ZOLTEK before distribution of fees from the remainder under the [April 1996 Agreement].
> …
>
> Section 2(a) of the [April 1996 Agreement] . . . shall be modified as follows: As attorneys' fees, MONCO/MORTIMER shall receive thirty-eight percent (38%) of the NET RECOVERIES actually received by ZOLTEK in connection with their representation of ZOLTEK in the pending lawsuits and appeals.

R. 232, Ex. F at 2-3. The 2011 Modification also provided:

> ZOLTEK and MONCO/MORTIMER each acknowledge that they have reviewed this MODIFICATION to the Retainer Agreement with counsel prior to signing, and that each has entered into it freely, voluntarily and knowingly.

*Id.* at 3. All other relevant terms from the April 1996 Agreement—including regarding Monco and Mortimer's option to continue the litigation for themselves notwithstanding Zoltek's wish to terminate it, and regarding settlement—remained in effect. *Id.*

### Internal Wood Phillips agreements and handling of Stealth litigation.

Wood Phillips' partnership agreement provides for the division of expenses related to staff and overhead. ZSOF ¶ 13. The partnership agreement also dictates the handling of unpaid invoices by Wood Phillips clients. *Id.* ¶ 23. All Stealth litigation invoices were at all times issued by Wood Phillips. *Id.* ¶ 28. All Zoltek payments for the Wood Phillips invoices were at all times made to Wood Phillips. *Id.* ¶ 30. All Stealth litigation expenses were processed through Wood Phillips. *Id.* ¶ 27.

Wood Phillips also has an internal agreement regarding the distribution of funds from contingent fee cases (the "Contingent Fee Agreement"). That agreement provides in relevant part that:

> It is the understanding of the Firm and the Partners who participate in any Contingent Fee Case that the Contingent Fee Case involves a combination of the Firm and the individual participating Partners, and the shares of the Recovery distributed to the Partners participating in the Contingent Fee Case as set forth above are not at any time assets of the Firm.

R. 232, Ex. E ¶ 8; ZSOF ¶ 21. The Contingent Fee Agreement further specifies the order and method for distributing any contingent fee recovery amongst Wood Phillips and its partners, with the amount of any individual partner's fee award contingent upon, among other things, the size of the overall recovery. R. 232, Ex. E ¶ 7. The

parties dispute whether the Contingent Fee Agreement applies to the Stealth litigation after Monco and Mortimer signed the April 1996 Agreement. ZSOF ¶ 21; MRSOF ¶ 21. But they agree that when Monco transitioned from partner to "of counsel" in 2010, he executed an agreement with Wood Phillips (the "Of Counsel Agreement"), which states in relevant part:

> [A]ny and all legal services performed by Monco will be on behalf of [Wood Phillips] and will be invoiced by [Wood Phillips].

*Id.* ¶¶ 15, 17, 18 and Ex. 4. The Of Counsel Agreement further provides that:

> Any and all existing contingency fee arrangements, specifically including existing agreements with: a) Zoltek Corporation regarding pending litigation against the United States and Lockheed Martin Corporation; . . . shall be governed solely and exclusively by the terms of the currently existing agreements as well as the Firm's related contingent fee agreement between the partners. Monco's change in status shall not in any way impact or alter the terms of the agreements identified in this paragraph.

*Id.* ¶ 22 and Ex. 4.

All told, Monco reported spending nearly 8,159 hours representing Zoltek in the Stealth litigation, and Mortimer reported 2,359 hours on the case. MSAF ¶ 34. Additionally, at least 15 other Wood Phillips attorneys together spent approximately 1,567 hours assisting with the Stealth litigation, and paralegals also recorded hours to Wood Phillips. ZSOF ¶ 25; MSAF ¶ 34. Court filings utilized the Wood Phillips signature block. ZSOF ¶ 25. And correspondence from Monco to Zoltek was on Wood Phillips letterhead. *Id.* ¶ 26. Both Monco and Mortimer were protected under Wood Phillips' malpractice insurance policy at all relevant times. *Id.* ¶ 20. There is no evidence that either Monco or Mortimer maintained separate insurance.

***Resolution of the Stealth Litigation.*** The parties dispute whether Zoltek terminated its representation by Wood Phillips or Monco and Mortimer in summer 2016, although they agree that the relationship terminated at that time. ZSOF ¶ 31 (stating "Zoltek terminated Wood Phillips in the summer of 2016"); MRZSOF ¶ 31 ("the Amended Complaint states that Monco/Mortimer were terminated in the Summer of 2016"). Zoltek settled the Stealth litigation shortly thereafter, and Plaintiffs recovered nothing.

## C.    Analysis of Zoltek's Partial Motion for Summary Judgment

"Article III of the Constitution limits federal judicial power to certain 'cases' and 'controversies,' and the 'irreducible constitutional minimum' of standing contains three elements." *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559-60 (1992)). Specifically, the plaintiff must have "(1) . . . suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). "As a jurisdictional requirement, the plaintiff bears the burden of establishing standing." *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009). That a plaintiff "must suffer an invasion of a legally protected interest is a principal of federal law. But the nature and extent of [the plaintiff's] interest . . . , and therefore, whether that interest can form the basis of a federal suit, depend on the law that defines [the plaintiff's] rights." *Scanlan v. Eisenberg*, 669 F.3d 838, 842 (7th Cir.

2012). Here, the parties agree that Illinois state law governs any claim for *quantum meruit* in this case, and therefore also governs the standing determination. R. 197 at 3; R. 230 at 8.

Separate from the jurisdictional Article III case-or-controversy requirement is the prudential limitation set forth in Federal Rule of Civil Procedure 17(a), providing that "[e]very action must be prosecuted in the name of the real party in interest," Fed. R. Civ. P. 17(a), and "requir[ing] that the complaint be brought in the name of the party to whom that claim 'belongs' or the party who 'according to the governing substantive law, is entitled to enforce the right.'" *Rawoof v. Texor Petroleum Co., Inc.*, 521 F.3d 750, 756 (7th Cir. 2008) (quoting *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 193 (2d Cir. 2003)); *see also RK Co. v. See*, 622 F.3d 846, 850 (7th Cir. 2010) ("the real party in interest rule is only concerned with whether an action can be maintained in the plaintiff's name," and is "similar to, but distinct from, constitutional . . . standing"). Put another way, Rule 17(a) is "a codification of the principle that a litigant cannot sue in federal court to enforce the rights of third parties—in other words, a prudential limit on standing." *Act II Jewelry, LLC v. Wooten*, 301 F. Supp. 3d 905, 911 (N.D. Ill. 2018). The real party in interest is "the one who by the substantive law, possesses the right sought to be enforced, and not necessarily the person who will ultimately benefit from the recovery." *Id.* at 910 (quoting *Checkers, Simon & Rosner v. Lurie Corp.*, 864 F.2d 1338, 1343 (7th Cir. 1988) (internal citations omitted)). The purpose of the rule is to "protect the defendant

against a subsequent action by the party actually entitled to recover." *RK Co.*, 622 F.3d at 850 (citing Fed. R. Civ. P. 17(a) advisory committee note (2009)).

Here, Zoltek challenges both Monco and Mortimer's standing, and whether they are the real parties in interest under Rule 17. But Zoltek's motion and briefs largely conflate the two issues, focusing primarily on the real party in interest inquiry as opposed to the Article III case-or-controversy question. Accordingly, and because Monco and Mortimer appear to have constitutional standing in any case—having suffered an actual concrete and particularized injury (failure to be compensated for work on behalf of Zoltek), traceable to Zoltek (the client for whom the work was performed), and which would be redressed by a decision awarding fees in *quantum meruit*—the Court's analysis focuses on Rule 17.[7]

---

[7] Even an indirect injury can establish Article III standing, although it may not suffice for Rule 17 purposes. *See, e.g.*, *Rawoof*, 521 F.3d at 756 (in shareholder derivative suit, plaintiff "satisfie[d] the minimum requirements of constitutional standing by virtue of an asserted indirect injury as [corporation's] sole shareholder," but was not the real party in interest). While Zoltek argues that *Freed v. JP Morgan Chase Bank*, 2012 WL 3307091 (N.D. Ill. Aug. 13, 2012) holds otherwise, *Freed* was not decided on constitutional standing grounds. To the contrary, there, as in *Rawoof*, the court found that the plaintiff had Article III standing (in this case, to assert a civil conspiracy to commit fraud claim as a partner in an LLC and on its behalf), but that he was not a real party in interest under Rule 17. 2012 WL 3307091, at *5 ("It bears mentioning that this holding does not turn on 'standing' in the constitutional sense. Freed certainly suffered an injury-in-fact if the LLC in which he has a stake was wrongfully deprived of its funds. Rather, the question turns on ascertaining the real party in interest under Rule 17(a)," and concluding that partner was not because "the harm [wa]s a general one inflicted upon the company, rather than directly on a specific stockholder or officer.").

### 1.    Rule 17

Ultimately, the parties dispute whether Monco and Mortimer's representation of Zoltek after the execution of the April 1996 Agreement was on behalf of Wood Phillips. Zoltek argues that it was, and that Monco and Mortimer are not proper plaintiffs here because, as attorneys with Wood Phillips, their only claim for recovery from Zoltek is through Wood Phillips. R. 197 at 4. Monco argues that it was not, relying upon the April 1996 Agreement and 2011 Modification to which he and Mortimer are signatories and which by their terms grant a right in Monco and Mortimer alone to certain compensation. *See generally* R. 230. Although only Monco and Mortimer's claims to *quantum meruit* relief are the subject of Zoltek's motion, the Court addresses both Wood Phillips' claim and Monco and Mortimer's individual claims in an effort to dispel the confusion that arose in the briefs, beginning with Wood Phillips'.

***Wood Phillips.*** There can be no dispute that Wood Phillips at all times maintained an interest in the Stealth litigation, and thus that it has the right to seek recovery from Zoltek as a real party in interest. Indeed, despite Monco and Mortimer's signatures on the April 1996 Agreement, the letter to Zoltek accompanying the April 1996 Agreement makes clear that the change in signatories was "for internal purposes *within our firm*," hardly supporting a finding that the Stealth litigation shifted away from Wood Phillips entirely. *See* ZSOF ¶ 10 and Ex. 1 (emphasis added). Neither did the parties treat the engagement differently thereafter. Indeed, the evidence shows that Monco and Mortimer continued to act in all respects as attorneys

of the Wood Phillips firm, and that each of the parties comported itself with the understanding that the Stealth litigation was Wood Phillips' case. All expenses went through Wood Phillips, not Monco or Mortimer. All invoices were sent from Wood Phillips, not Monco or Mortimer. All Zoltek payments were to Wood Phillips, not Monco or Mortimer. Correspondence came on Wood Phillips letterhead, not Monco or Mortimer's. Court documents were filed in Wood Phillips' name. Further, through the years, Monco and Mortimer utilized firm staff and resources, including Wood Phillips secretaries and paralegals, who assisted with the Stealth litigation as they would any other firm matter. And 15 different Wood Phillips attorneys collectively billed over 1,500 Wood Phillips hours to assist Monco and Mortimer in the Stealth litigation— no doubt time they could have spent on other firm matters.

Plaintiffs' internal agreements also make clear that the Stealth litigation was at all times a Wood Phillips case. First, the Contingent Fee Agreement provides that contingent fee cases "involve[ ] a *combination* of the Firm and the partners," and therefore not any individual attorneys alone. R. 232, Ex. E ¶ 8 (emphasis added). While Monco contends that the Contingent Fee Agreement did not apply to the Stealth litigation after he and Mortimer executed the April 1996 Agreement, MRZSOF ¶ 24 and R. 230 at 7, his argument is belied by his Of Counsel Agreement, which indicates that each contingency fee arrangement would be governed by the terms of the existing contingency agreement with the client "*as well as* the Firm's related contingent fee agreement between the partners," specifically referencing and including the Stealth litigation. ZSOF ¶ 22 and Ex. 4 (emphasis added). The

agreement further provides that Monco's status change to "of counsel" would not "in any way impact or alter the terms of the agreements identified." *Id.* But even more compelling is the Of Counsel Agreement's prohibition of the kind of "side deal" Monco contends occurred through the April 1996 Agreement. *See id.* ¶ 18 and Ex. 4 ("[A]ny and all legal services performed by Monco will be on behalf of [Wood Phillips] and will be invoiced by [Wood Phillips]"). Accordingly, there can be no reasonable inference other than that the Stealth litigation was always a firm case, and Wood Phillips is a real party in interest under Rule 17(a).

**Monco and Mortimer.** But Monco and Mortimer are also real parties in interest for purposes of Plaintiffs' *quantum meruit* claim. Indeed, Section 2(a) of the April 1996 Agreement refers to contingency recovery *only* by Monco and Mortimer, not Wood Phillips, creating privity as to Monco and Mortimer for compensation purposes. *See Kaplan v. Shure Bros., Inc.*, 266 F.3d 598, 602 (7th Cir. 2001) ("Privity of contract has been defined as 'mutual or successive relationship to the *same rights of property*," and "may arise by operation of law, by descent, or by voluntary or involuntary transfer" (quoting *Collins Co., Ltd. v. Carboline Co.*, 125 Ill.2d 498, 511 (1988) (emphasis added))). And while the 2011 Modification refers to Wood Phillips and Wood Phillips associates in the paragraphs concerning hourly billable rates, as under the April 1996 Agreement, only Monco and Mortimer are potential recipients of any contingency recovery. Further, the April 1996 Agreement provides that Monco and Mortimer, not Wood Phillips, would be entitled to the reasonable value of their services if Zoltek terminated the agreement—a provision unaffected by the 2011

Modification. And it is undisputed that the omission of Wood Phillips' name from the signature line was no accident: Wood Phillips sought to withdraw its name from the client agreement to further its own interests. *See* MSAF ¶ 17; R. 232, Ex. U at 3; ZRMSAF ¶ 12. As such, Wood Phillips cannot now be heard to complain about the effects of that decision. Accordingly, Monco and Mortimer, with privity for purposes of compensation, are real parties in interest along with Wood Phillips. *See In re Nat'l Underground Const. Co., Inc.*, 40 B.R. 1020, 1021 (N.D. Ill. 1984) ("only a party to a contract or those in privity may enforce the contract"); *see also Act II Jewelry, LLC*, 301 F. Supp. 3d at 911-12 ("There may be multiple real parties in interest for a given claim." (quoting 1 Federal Rules of Civil Procedure, Rules and Commentary Rule 17(a) (internal quotations omitted))).

Zoltek nevertheless contends that the *quantum meruit* claim is Wood Phillips' alone, arguing that the April 1996 Agreement (and 2011 Modification thereto): (1) is void as against public policy, R. 230 at 4-5; R. 237 at 3-4; and 2) was terminated when Zoltek terminated the attorney-client relationship even if it was not void. R. 237 at 2-3. The Court notes at the outset that Zoltek's arguments implicitly acknowledge that the April 1996 Agreement created a direct relationship between Zoltek and Monco and Mortimer for compensation purposes. Zoltek does not meaningfully argue otherwise. And Zoltek's voidness arguments do not take aim at the compensation provisions at issue in any case. Instead, Zoltek's focus is on the provisions prohibiting Zoltek from settling or ending the Stealth litigation without Monco and Mortimer's consent (Section 6), and giving Monco and Mortimer the right to carry on the

litigation on Zoltek's behalf but "solely to the benefit of Monco and Mortimer" (Section 5).[8] *Id.* at 5 (citing Illinois Ethics Rules 1.2(a), stating "A lawyer shall abide by a client's decision whether to settle a matter," and 1.8, precluding business transactions by an attorney with the client to a client's detriment). Monco responds that any technical violation of the ethics rules is excused by Monco (and Mortimer's) repeated recommendations that Zoltek consult separate counsel prior to signing the agreements. R. 230 at 14-15. But even assuming these provisions are void *ab initio* against public policy, the privity Monco and Mortimer enjoy for compensation purposes under *quantum meruit* remains intact.[9] *See Edens View Realty &*

---

[8] Zoltek argues that Monco and Mortimer actually exercised their right to take over the Stealth litigation via Section 5 of the April 1996 Agreement through a November 3, 2014 email. *See* ZSOF ¶ 41 ("Monco and Mortimer exercised Section 5" through the email). Monco disagrees. *See* MRZSOF ¶ 41 (the email merely "invited further discussion"). But there is no dispute that Monco and Mortimer continued to represent Zoltek until Zoltek terminated the relationship in 2016. Accordingly, Monco and Mortimer could not have exercised this right.

[9] In its February 27, 2019 opinion, the Court dismissed Zoltek's counterclaim seeking a declaratory judgment that the April 1996 Agreement and 2011 Modification were void as impermissible modifications of a fee agreement. In addition to holding that Zoltek's counterclaim was moot because the agreements had been terminated, the Court held that Zoltek failed to state a plausible claim that the agreements were void, given Zoltek's status as a sophisticated client that never sought to rescind the agreements about which it now complains, and failure to cite a single case even remotely analogous that concluded otherwise. R. 257 at 10-13. Here, Zoltek relies on those same cases, along with three "new" cases: an 1897 Illinois Supreme Court opinion, *North Chicago Street Railroad Company v. Ackley*, 171 Ill. 100 (Ill. 1897), and Illinois appellate court opinions from 1922 and 1986, *Barnes et al. v. Barnes et al.*, 225 Ill. App. 68 (Ill. App. Ct. 1922) and *Herbster v. North American Company for Life and Health Insurance*, 501 N.E.2d 343 (Ill. App. Ct. 1986), respectively. But while *North Chicago* and *Barnes* do state that contingency agreements prohibiting settlement absent attorney consent are void, neither concern a sophisticated client like Zoltek. *See N. Chi. R.R. Co.*, 171 Ill. at 101 (personal injury client); *see also Barnes*, 225 Ill. App. at 69 (client settling deceased husband's estate). And the issue was not before the *Herbster* court. *See Herbster*, 501 N.E.2d at 347-48 (discussing a

*Investment, Inc. v. Heritage Enterprises, Inc.*, 408 N.E.2d 1069, 1075 (Ill. App. Ct. 1980) (for an agreement voided by statute, recovery under *quantum meruit* possible where such recovery would not circumvent the statutory provisions that prohibited the agreement); *see also Progressive Realty Advisors, Inc. v. Great-West Life Assur. Co.*, 783 F. Supp. 1114, 1120 (N.D. Ill. 1991) (a plaintiff may recover for services rendered under *quantum meruit* theory even though underlying contract is void (citing *Edens View Realty & Investment, Inc.*, 408 N.E.2d at 1075)).

And to the extent Zoltek argues that the April 1996 Agreement and 2011 Modification are terminated even if not void, that argument does not doom Monco's (and Mortimer's) *quantum meruit* claim. There can be no debate that "[w]hen a client fires an attorney who was retained on a contingency fee contract, that contract ceases to be effective and the attorney can no longer recover under it." *Dobbs v. Depuy Orthopaedics, Inc., et al.*, 885 F.3d 455, 457 (7th Cir. 2018) (citing *Thompson v. Buncik*, 961 N.E.2d 280, 283 (Ill. 2011)). "But the discharged attorney can recover a reasonable sum for services rendered based on *quantum meruit* ('as much as he deserves')." *Id.* at 457-58. Here, and again as the Court has previously explained, Plaintiffs do not seek relief other than through *quantum meruit*. R. 217; R. 257 at 10.

_____

client's right to settle in dicta before holding that a retaliatory discharge tort is not available to an attorney-plaintiff). But more to the point, none of these cases prohibit a party from using such an agreement to establish its right to *quantum meruit* relief. And that makes sense: after all, "[q]uantum meruit is a quasi-contract doctrine that allows the Court to imply the existence of a contract in order to prevent injustice." *Langone v. Miller*, 631 F. Supp. 2d 1067, 1071 (N.D. Ill. 2009); *see also Keck Garrett & Assoc. v. Nextel Commc'ns, Inc.*, 517 F.3d 476, 487 (7th Cir. 2008) (Illinois law does not permit recovery under *quantum meruit* when an actual contract governs the issue).

Thus, in actuality, Monco relies on the April 1996 Agreement only as evidence of an alleged individual right to proceed against Zoltek for fees. *See generally* R. 217 and R. 230. In other words, as evidence of an attorney-client relationship between Zoltek and Monco and Mortimer as individuals for purposes of an award based on *quantum meruit*. *See Wildman, Harrold, Allen & Dixon*, 740 N.E.2d at 509 (prima facie case for attorney's fees based on *quantum meruit* "includes proof of . . . the existence of an attorney-client relationship").

Finally, Zoltek is correct that two of the three cases Monco relies upon do not in fact require the Court to deem Monco (or Mortimer) a real party in interest under Rule 17(a). Indeed, while both *Dobbs v. Depuy Orthopedics, Inc. et al.*, 842 F.3d 1045 (7th Cir. 2016) and *Bernstein and Grazian, P.C. v. Volpe, P.C.*, 931 N.E.2d 810 (Ill. App. Ct. 2010) concern an individual attorney recovering under a *quantum meruit* theory, neither discuss Rule 17(a) (or Article III standing), and nor do they discuss whether the plaintiff was a party to any agreement with his firm or the client regarding payment or distribution of fees, or how the suit came to be filed in the individual attorney's name. *See generally Dobbs*, 842 F.3d 1045 (vacating and remanding *quantum meruit* award in case by attorney against former client on behalf of himself and his former law firm because the trial court had not analyzed the factors relevant to calculating reasonable attorneys' fees under *quantum meruit*);[10] *see also*

---

[10] Those factors include "the time and labor required, the attorney's skill and standing, the nature of the cause, the novelty and difficulty of the subject matter, the attorney's degree of responsibility in managing the case, the usual and customary charge for that type of work in the community, and the benefits resulting to the

*Bernstein and Grazian, P.C.*, 931 N.E.2d 810 (reversing *quantum meruit* award to attorney and law firm in suit against former partner and new firm for a share of fees recovered from their work because plaintiff-attorney had not provided enough evidence to determine the reasonable value of his work).

But Monco's reliance on *In re Estate of Callahan*, 578 N.E.2d 985 (Ill. 1991)—a case in which a law firm assigned its claim for attorney fees in *quantum meruit* to one of its individual members—is closer to the mark. While Monco does not argue directly that an assignment was made here, the change in the beneficiaries of the compensation provisions from Wood Phillips to Monco and Mortimer (at Wood Phillips' direction) sure seems like one. So construed, there is little question about Monco and Mortimer's status as plaintiffs. *See Sprint Comms. Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 285 (2008) ("Lawsuits by assignees . . . are 'cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process'" (quoting *Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 777-78 (2000))); *see also Overseas Dev. Disc. Corp. v. Sangamo Const. Co., Inc.*, 686 F.2d 498, 505 n.17 (7th Cir. 1982) ("[t]he federal courts . . . and all of the state courts . . . have been in full accord in holding that the unconditional assignee of a complete chose of action is the real party in interest [under Rule 17]" (quoting 3A Moore's Federal Practice ¶ 17.09(1.-1) at 17-84)).

---

client." *Dobbs*, 842 F.3d at 1049-50 (quoting *Will v. Nw. Univ.*, 881 N.E.2d 481, 504-05 (Ill. App. Ct. 2007)).

In sum, and despite Zoltek's voidness arguments, Zoltek cannot sidestep the fact that the agreements evidence a right in Monco and Mortimer to any contingency recovery. This is enough to solidify Monco and Mortimer's individual claims for *quantum meruit* relief. Indeed, the agreements—terminated though they may be— together with the undisputed evidence of Monco and Mortimer's performance thereunder establish that Monco and Mortimer performed services for Zoltek on a non-gratuitous basis, that Zoltek accepted the services, and that, because Monco and Mortimer were individual signatories to the agreements of which they were the sole beneficiaries of any contingency award—an attorney-client relationship existed between them and Zoltek, other than through Wood Phillips. *See Bernstein & Grazian, P.C.*, 931 N.E.2d at 825-26 ("To recover under a *quantum meruit* theory, the plaintiff must prove that: (1) he performed a service to benefit the defendant, (2) he did not perform this service gratuitously, (3) the defendant accepted this service, and (4) no contract existed to prescribe payment for this service."); *see also In re Chicago Flood Litigation*, 682 N.E.2d at 427 ("The right to attorney fees based on *quantum meruit* does not exist unless there is an underlying attorney-client relationship where the client expressly or impliedly agrees to pay fees."). Accordingly, Monco and Mortimer are real parties in interest under Rule 17.

### 2. Rule 19

Monco also argues that summary judgment is improper because he is a necessary party under Federal Rule of Civil Procedure 19(a)(1)(B). R. 230 at 12-13. In response, Zoltek contends that Monco's recovery is determined by his internal

agreements with Wood Phillips—essentially the same argument it makes with respect to Rule 17(a). But because the Court has determined that Monco (and Mortimer) are real parties in interest under Rule 17(a), the Court need not also examine Rule 19(a)(1). *See In re Chicago Flood*, 1993 WL 116756, at *2 (N.D. Ill. Apr. 15, 1993) ("The Seventh Circuit regards Fed. R. Civ. P. 17(a) as an independent authority for compulsory joinder, thus the prerequisites of Rule 19(a) need not be satisfied before joinder is appropriate under Rule 17(a)."); *see also Forza Techs., LLC v. Premier Research Labs, LP*, 2013 WL 6355383, at *4 (N.D. Ill. Dec. 5, 2013) ("Given the court's conclusion [that Fitness Arts was a real party in interest under Rule 17(a)], the court need not address the defendants' argument that Fitness Arts is a necessary party pursuant to Rule 19(a)(1)").

### D. Summary

The undisputed evidence demonstrates that each of Zoltek, Wood Phillips, and Monco and Mortimer regarded Zoltek as a Wood Phillips client and the Stealth litigation as Wood Phillips' case. As such, Wood Phillips is a real party in interest entitled to reasonable attorney's fees under *quantum meruit*. But the evidence also shows that Monco and Mortimer are real parties in interest and may seek relief other than through Wood Phillips, having signed the most recent client agreements at Wood Phillips' urging. Accordingly, and to guard against the injustice the doctrine of *quantum meruit* was designed to prevent, the Court denies Zoltek's partial motion for summary judgment as to Monco and Mortimer. *See Langone*, 631 F. Supp. 2d at 1071 ("Quantum meruit is a quasi-contract doctrine that allows the Court to imply the

existence of a contract in order to prevent injustice." (citing *Hayes Mech., Inc.,* 812 N.E.2d at 426)).

## CONCLUSION

For the foregoing reasons, Rumy's motion to dismiss, R. 259, is granted with prejudice, and Zoltek's motion for partial summary judgment, R. 196, is denied.

ENTERED:

_Thomas M Durkin_

_____

Honorable Thomas M. Durkin
United States District Judge

Dated: July 25, 2019