## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| DEAN A. MONCO; JOHN S. MORTIMER; WOOD, PHILLIPS, KATZ, CLARK & MORTIMER | |
| Plaintiffs, | Case No. 17-cv-06882 |
| v. | Judge Martha M. Pacold |
| ZOLTEK CORPORATION, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Dean A. Monco, John S. Mortimer, and Wood, Phillips, Katz, Clark, & Mortimer ("Wood Phillips") seek recovery of legal fees from defendant Zoltek Corporation on a quantum meruit theory for their representation of Zoltek in patent litigation spanning the course of 20 years. Monco has moved for summary judgment on Counts 2 and 3 of Zoltek's counterclaim and Zoltek's second, third, and fifth affirmative defenses. [305]. Zoltek has moved for summary judgment on Plaintiffs' affirmative defenses and certain additional issues. [367]. For the following reasons, both motions are denied.

Monco has also filed a motion for leave to add judicial estoppel as an affirmative defense to Zoltek's counterclaims [387] and a motion to strike portions of Zoltek's response to the latter motion [409]. The motion for leave to add judicial estoppel as an affirmative defense [387] is granted; the motion to strike [409] is denied.

## BACKGROUND

The court assumes familiarity with Judge Durkin's decisions in the case. *See Monco v. Zoltek Corp.*, No. 17-cv-06882, 2018 WL 5311904 (N.D. Ill. Oct. 26, 2018); 2019 WL 952138 (N.D. Ill. Feb. 27, 2019); 397 F. Supp. 3d 1165 (N.D. Ill. July 25, 2019). These decisions describe the background facts and procedural history in additional detail. The court restates those facts only as necessary.

In evaluating the parties' motions for summary judgment, the court draws from the parties' statements of material fact. *See Omnicare, Inc. v. UnitedHealth*

*Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (citation omitted). The following facts are derived from the parties' statements of undisputed material facts. The court includes in this background section only those portions of the statements of fact that are appropriately presented, supported, and relevant to resolution of the pending motions.

Defendant Zoltek is a carbon fiber manufacturer. MSOF, [325] ¶ 4.[1] Plaintiff Wood Phillips is a law firm organized as a legal partnership, and plaintiffs Monco and Mortimer are attorneys who were partners or of counsel with Wood Phillips throughout the Zoltek representation. [325] ¶¶ 1–3.

In 1996, Zoltek hired Plaintiffs to represent it in litigation concerning a Zoltek patent (the "Stealth litigation"). [325] ¶ 6. The parties set forth their legal relationships and the fee arrangements for the Stealth litigation in several agreements. [325] ¶¶ 6–10.

In 1996, Zoltek, represented by Plaintiffs, began the litigation by filing suit in the Court of Federal Claims against the government, alleging that the B-2 bomber used carbon fiber sheet products that infringed Zoltek's patent. [371] ¶¶ 2–3.

The Stealth litigation continued for about 20 years. The litigation included multiple appeals to the Federal Circuit and a trial in the Court of Federal Claims. The parties agree that Plaintiffs represented Zoltek as lead counsel for almost all of the 20 years, though they dispute how to characterize Plaintiffs' role during a period between 2009 and 2011. *See* ZSOF, [371] ¶ 4; M.'s Resp. ZSOF, [380] ¶ 4.

Five years into the case, in 2001, Zoltek, relying on Plaintiffs' advice, filed an amended complaint alleging (in addition to the existing B-2 bomber claim) that materials used in the F-22 fighter jet infringed Zoltek's patent. [371] ¶ 5. As Plaintiffs explained to Zoltek, the theory of infringement for the F-22 relied on the

---

[1] Bracketed numbers refer to docket entries and are followed by the page and / or paragraph number. Page numbers refer to the ECF page number. Citations to the parties' Local Rule 56.1 Statements of Fact are identified as follows: "ZSOF" for Zoltek's Statement of Facts, [354], [371], "MSOF" for Monco's Statement of Facts, [325], [380], "WSOF" for Wood Phillips and John Mortimer's Statement of Facts, [384], "M.'s Resp. ZSOF" for Monco's response to Zoltek's Statement of Facts, [361], [380], "Z.'s Resp. MSOF" for Zoltek's response to Monco's Statement of Facts, [354], [403], and "W.'s Resp. ZSOF" for Wood Phillips and John Mortimer's response to Zoltek's Statement of Facts, [384].

The majority of the briefs and statements of fact in this case are sealed. When the court refers to a sealed document, it attempts to do so without revealing any information that could reasonably be deemed confidential. The court discusses information from these documents only to the extent necessary to explain the path of the court's reasoning. *See In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010); *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000).

doctrine of equivalents, since the F-22 used silicon carbide fibers instead of exclusively carbon-based fibers. [371] ¶ 9. Many of the legal proceedings in the case arose from the F-22 claim. [371] ¶ 11.

After a three-day trial, the Court of Federal Claims held in March 2014 that Zoltek's patent was invalid. [325] ¶ 33. Monco and Mortimer briefed and argued an appeal before the Federal Circuit. In February 2016, the Federal Circuit reversed and held that Zoltek's patent was valid. [325] ¶ 41.

On July 16, 2016, Zoltek terminated Plaintiffs as counsel in the Court of Federal Claims proceedings. In September, Zoltek removed Plaintiffs from all further involvement in the case. [325] ¶ 42; [380] ¶ 42. Shortly after, on October 12, 2016, Zoltek (represented by new counsel) and the government engaged in mediation and settled the case for $20 million. [325] ¶ 43. The court entered judgment in that amount on March 20, 2017. [325] ¶ 44.

For present purposes, the following procedural history is relevant: Plaintiffs filed this lawsuit in September 2017. [1]. Plaintiffs filed the operative second amended complaint in October 2018, which among other things seeks recovery of attorneys' fees from Zoltek on a quantum meruit theory. [217]. Zoltek filed a three-count counterclaim, the operative version of which seeks a declaratory judgment that a certain attorney-client agreement and modification were void (Count 1) and alleges breach of fiduciary duty and professional negligence by Monco, Mortimer, and Wood Phillips (Counts 2 and 3). [243] at 45–49.

Plaintiffs moved to dismiss Zoltek's counterclaim. In February 2019, Judge Durkin granted in part and denied in part that motion. The court dismissed Count 1 (regarding the attorney-client agreement and modification) but declined to dismiss Zoltek's professional negligence and breach of fiduciary duty claims (Counts 2 and 3). [257]; 2019 WL 952138, at *4–10.

In July 2019, Judge Durkin denied Zoltek's partial motion for summary judgment and held that Wood Phillips, Monco, and Mortimer are all real parties in interest and could seek attorneys' fees directly from Zoltek. [288]; 397 F. Supp. 3d at 1183–84.

Monco now moves for summary judgment on Counts 2 and 3 of Zoltek's counterclaim and Zoltek's second, third, and fifth affirmative defenses, [305], while Zoltek moves for summary judgment on Plaintiffs' affirmative defenses and the issue of how any quantum meruit award would be calculated. [367]. Monco also moves for leave to add judicial estoppel as an affirmative defense to Zoltek's counterclaims [387] and to strike portions of Zoltek's response to that motion [409].

## DISCUSSION

Monco and Zoltek have each filed a motion for summary judgment.[2]  Rule 56's procedural requirements apply separately to each one.  *See Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 603 (7th Cir. 2015); *Brownlee v. Catholic Charities of the Archdiocese of Chicago*, No. 16-cv-00665, 2020 WL 977968, at *2 (N.D. Ill. Feb. 28, 2020) ("Each movant and nonmovant 'must individually satisfy the requirements of Rule 56.'" (quoting *United Transp. Union v. Ill. Cent. R.R. Co.*, 998 F. Supp. 874, 880 (N.D. Ill. 1998))).

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The substantive law controls which facts are material.  *Id.*

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact.  *See Celotex*, 477 U.S. at 323 (1986).  After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250 (quotation omitted).  The court construes the evidence and facts supported by the record in favor of the non-moving party, and gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor."  *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (citations omitted).  "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment."  *Id.* (citation omitted).  On cross motions for summary judgment, the court draws inferences "in favor of the party against whom the motion under consideration was made."  *Bentrud v. Bowman, Heintz, Boscia & Vician, P.C.*, 794 F.3d 871, 874 (7th Cir. 2015) (citing *McKinney v. Cadleway Props., Inc.*, 548 F.3d 496, 500 (7th Cir. 2008)).

For cross motions aimed at the same claim or defense, the court adopts "a dual, 'Janus-like' perspective."  *Hotel 71*, 778 F.3d at 603 (citing *Shiner v. Turnoy*, 29 F. Supp. 3d 1156, 1160 (N.D. Ill. 2014)).  For the first motion, the court views the facts and inferences in the light most favorable to the nonmovant.  If that motion is denied, the court turns to the cross motion and gives the unsuccessful movant "all of the favorable factual inferences that it has just given to the movant's opponent."  *Id.*

---

[2] Mortimer and Wood Phillips filed a brief in response to Zoltek's motion. [383].  They also adopted arguments in Monco's response brief subject to certain qualifications. [383] at 7.

(citing *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engrs., Local Union 150*, 335 F.3d 643, 647–48 (7th Cir. 2003)). This dual perspective may result in a denial of both motions. *See Shiner*, 29 F. Supp. 3d at 1160.

## I.   Zoltek's Counterclaims

The court begins with Zoltek's remaining counterclaims for breach of fiduciary duty (Count 2) and professional negligence (Count 3).[3] Again, Count 1 has already been dismissed.

According to Zoltek, the "primary act of malpractice" underlying both these claims was Plaintiffs' decision to pursue a legal theory under which the F-22 fighter jet infringed a Zoltek patent. [354] at 39 ¶ 7. Indeed, this is the only act of malpractice that Zoltek relies on to oppose Plaintiffs' motion for summary judgment or to press its own motion for summary judgment. According to Zoltek, a reasonable patent attorney would have known the F-22 did not infringe the patent "under any patent law doctrine, including the doctrine of equivalents." [354] at 39 ¶ 7. Zoltek contends that the doctrine of equivalents theory was never viable since the silicon carbide used on the F-22 is not "equivalent" to Zoltek's patented carbon fiber. While Zoltek received $20 million in the settlement of the patent litigation, it argues that pursuit of the F-22 claim—as opposed to sole pursuit of Zoltek's separate claim about the B-2 bomber—delayed resolution of the case and resulted in unnecessary legal fees.

### A.   Judicial Estoppel

The court begins with Monco's argument (raised only in opposition to Zoltek's motion) that Zoltek should be judicially estopped from arguing that Plaintiffs' theory of infringement for the F-22 was meritless.[4] According to Monco, Zoltek

---

[3] In Illinois, plaintiffs may "plead separate counts alleging both professional negligence and a breach of fiduciary duty" against an attorney. *Calhoun v. Rane,* 234 Ill. App. 3d 90, 95, 599 N.E.2d 1318, 1321 (1992).

[4] Monco moved separately for leave to add judicial estoppel as an affirmative defense. [387]. That motion is granted. Rule 15(a) provides that courts should grant leave to amend responsive pleadings "freely give when justice so requires." Considering the evolution of Zoltek's malpractice theory in this case, the court cannot conclude that Monco unduly delayed in asserting this defense. Zoltek also argues that the judicial estoppel defense is futile, but the court does not reach this issue. In the interests of judicial economy, the court simply evaluates the parties' arguments about the viability of the defense on the factual record at summary judgment, rather than on the pleadings under the rubric of futility. Moreover, even if Monco did not plead judicial estoppel as an affirmative defense, the court could still reach the issue here. As Monco notes, the court may properly apply judicial estoppel *sua sponte*. *See Davis v. Dist. of Columbia*, 925 F.3d 1240, 1256 (D.C. Cir. 2019). However, to the extent the parties' briefs on the separate motion for leave to add judicial

argued that the F-22 infringed a Zoltek patent at the 2016 mediation, and obtained a favorable resolution of that case—a $20 million settlement—on that basis.

Judicial estoppel "prevents a party from adopting a position in a legal proceeding contrary to a position successfully argued in an earlier legal proceeding." *Amerisure Mut. Ins. Co. v. Iron Mountain Info. Mgmt., LLC*, No. 18-cv-05317, 2020 WL 5085373, at *4 (N.D. Ill. May 7, 2020) (quoting *Murata Mfg. Co. v. Bel Fuse, Inc.*, 422 F. Supp. 2d 934, 947 (N.D. Ill. 2006)). Although this is a diversity suit, "federal judicial estoppel law controls." *Commonwealth Ins. Co. v. Titan Tire Corp.*, 398 F.3d 879, 887 n.6 (7th Cir. 2004) (citing *Ogden Martin Sys. of Indianapolis, Inc. v. Whiting Corp.*, 179 F.3d 523, 527 n.1 (7th Cir. 1999)).

The Supreme Court has "observed that the standard for invoking judicial estoppel is 'not reducible to any general formulation of principle,' but recognized three factors that 'typically inform the decision whether to apply the doctrine in a particular case.'" *In re Knight-Celotex, LLC*, 695 F.3d 714, 722 (7th Cir. 2012) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001)). "Those factors are first, that 'a party's later position must be clearly inconsistent with its earlier position;' second, that 'the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or second court was misled;' and third, that 'the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.'" *Knight-Celotex*, 695 F.3d at 721–22 (quoting *New Hampshire*, 532 U.S. at 750–51).

The parties first dispute whether there is a clear inconsistency between Zoltek's position in the 2016 mediation and its present position in this case. Monco argues that Zoltek's Mediation Statement asserted infringement by the F-22 as one of the grounds for settlement. [380] at 25–27 ¶¶ 28–31. Zoltek's cover letter to the mediation judge also referenced F-22 infringement and asserted a claim for $85,501,958 in damages based on that infringement. [380] at 27 ¶ 32.

Zoltek responds that in the mediation brief Zoltek did not mention silicon carbide or the doctrine of equivalents. It argues: "As specifically noted by Zoltek in the mediation submissions, Zoltek did not know how much infringing carbon fiber sheet product was actually used by the US military. Zoltek now understands that no carbon fiber sheet product was used in the F-22." [427] at 11. In other words, Zoltek now argues that while Zoltek asserted in the mediation brief that the F-22 infringed, in the mediation brief Zoltek may have incorrectly assumed that the F-22

---

estoppel as an affirmative defense contain legal arguments distinct from those in the summary judgment briefs, the court considers those arguments here as well.

used carbon fiber sheet product instead of pressing the doctrine of equivalents theory of infringement Zoltek now attacks as malpractice.

Monco moved to strike this argument as relying on "demonstrably false" facts. [432].[5] He argues that the cover letter to the mediation judge stated: "The carbon sheet fiber used in the B-2 costs $5,125 per pound. The carbon-silicon fiber used in the F-22 costs $6,000." [380-7] at 3. Since the letter expressly notes that the F-22 used "carbon-silicon fiber" rather than carbon sheet fiber, it could not be true that Zoltek did not realize that the F-22 did not use carbon sheet fiber.

In response, Zoltek argues that the statements in its reply brief, which chiefly characterize its mediation brief (as opposed to the letter), are not "demonstrably false" as a technical matter. The court agrees, so the motion to strike is denied. Nonetheless, Zoltek does not meaningfully respond to Monco's argument that the letter undercuts its position that it did not know the F-22 used a different product at the time of mediation. Zoltek's response to the motion to strike retreats to the position that Monco has not shown that Zoltek sent the letter to the government or otherwise argued the doctrine of equivalents theory at mediation. [443] at 3–4. The court is not persuaded by this argument. It is not plausible that while Zoltek's letter to the mediation judge made clear that the F-22 used carbon-silicon fiber, Zoltek did not otherwise mention this fact during mediation or otherwise rely on a theory of liability for use of carbon-silicon fiber. The court agrees with Plaintiffs that Zoltek's presentation of the F-22 infringement claim during the 2016 mediation was inconsistent with its present theory that such a claim lacked merit.

But this is not the end of the inquiry. The court now turns to the second judicial estoppel factor—whether Zoltek succeeded in persuading the court to adopt its position. Zoltek argues that the Court of Federal Claims did not adopt Zoltek's position or make findings related to F-22 infringement. After mediation, Zoltek and the government jointly stipulated to Zoltek releasing all claims in exchange for entry of a $20 million judgment against the government. [380] at 27 ¶ 33. And the Court of Federal Claims simply entered that judgment. [380] at 27 ¶ 34.

However, in this circuit, judicial estoppel requires only "prevailing in the first case," not "obtaining a judicial decision." *Kale v. Obuchowski*, 985 F.2d 360, 361 (7th Cir. 1993). Thus, "under some circumstances, a settlement can satisfy the success requirement." *Remus v. Sheahan*, No. 05-cv-01495, 2006 WL 418654, at *11 (N.D. Ill. Feb. 16, 2006) (citing *Commonwealth Insurance Co. v. Titan Tire Corp.*, 398 F.3d 879, 887 & n.5 (7th Cir. 2004); *Kale*, 985 F.2d at 361–62). But "to apply judicial estoppel in the situation of a settlement, it still must be shown that the

---

[5] After Monco filed the original motion to strike, [409], the court allowed Zoltek to file an amended reply brief, [427], which rendered the motion moot. Monco then filed the present renewed motion to strike. [432].

party against whom estoppel is invoked succeeded on the pertinent position, or that the position was somehow a basis for or important to the settlement." *Remus*, 2006 WL 418654, at *11 (citing *Commonwealth*, 398 F.3d at 888). "Sometimes a settlement sidesteps the issue in the first case, so that neither side prevails on a particular contested issue. . . . Frequently, however, a settlement represents capitulation." *Kale*, 985 F.2d at 362 (citation omitted).

The question then is whether here the settlement represented "capitulation" by the government on the F-22 claim or instead sidestepped the issue. It is here that Monco's judicial estoppel argument falls short. Zoltek asserted infringement claims for both the B-2 and the F-22 at mediation, and Monco has not shown that the settlement resulted from one or the other. Zoltek argues that the consent judgment necessarily shows success on both the F-22 and B-2 claims, since "the F-22 was no 'tag along' claim; it received equal billing with Zoltek's claim of infringement against the B-2 Bomber." [378] at 14–15. But Monco has not shown what if any sway Zoltek's "equal billing" had on the settlement. The court cannot conclude from the record that in settling the case, either the government or the court accepted a doctrine of equivalents theory of infringement for the F-22.

Finally, Zoltek argues that it would not be appropriate to estop it from arguing that Plaintiffs' theory was malpractice just because it pursued that theory on Plaintiffs' advice. In *Mungo v. Taylor*, 355 F.3d 969 (7th Cir. 2004), the Seventh Circuit agreed that "it would make no sense" to apply judicial estoppel to bar the plaintiff's testimony where the plaintiff alleged that the defendant lawyer's "bad legal advice and pressure" convinced the plaintiff to give prior inconsistent testimony. *Id.* at 982. "[I]t would hardly be appropriate for the attorney who gave that bad advice to say that because her client testified in accordance with that bad advice that her client is estopped from asserting that the advice [is] bad." *Id.* (quotation omitted). So too here. Again, the court expresses no view on the merits of Zoltek's counterclaims. But Zoltek is not judicially estopped from asserting them.

### B.     Statute of Limitations

The next issue is timeliness. In support of his motion for summary judgment, Monco argues that Zoltek's counterclaims are untimely under the applicable statute of limitations. For its part, Zoltek moves for summary judgment on Plaintiffs' statute of limitations affirmative defense. In effect, the parties have filed cross motions on whether Zoltek's remaining counterclaims are time-barred.

The parties do not dispute that Zoltek's claims are subject to the two-year limitations period for actions against attorneys "arising out of an act or omission in the performance of professional services" under Illinois law. 735 ILCS 5/13-214.3(b). This period runs "from the time the person bringing the action knew or reasonably should have known of the injury for which damages are sought." *Id.*

8

Put another way, "a cause of action for legal malpractice does not accrue until a plaintiff discovers, or within a reasonable time should discover, his injury and incurs damages directly attributable to counsel's neglect." *Lucey v. Law Offices of Pretzel & Stouffer, Chartered*, 301 Ill. App. 3d 349, 353, 703 N.E.2d 473, 477 (1998).

### 1. Injury and Damages

The court first addresses when Plaintiffs' alleged malpractice injured Zoltek and caused damages. The parties do not argue that any substantive law applies other than that of Illinois, so the court applies the substantive law of Illinois. *See Camp v. TNT Logistics Corp.*, 553 F.3d 502, 505 (7th Cir. 2009) ("Because none of the parties raised the choice of law issue, we apply the substantive law of Illinois, the forum state."). In evaluating whether Zoltek's causes of action against Plaintiffs are time-barred, the court must attempt to "predict how the Illinois Supreme Court would decide the issue," examining "decisions of the lower state courts to help formulate an answer" where the Illinois Supreme Court has not passed on the issue. *Kaplan v. Shure Bros.*, 153 F.3d 413, 420 (7th Cir. 1998).

As Zoltek points out, the "general rule regarding malpractice claims based on the mishandling of litigation" in Illinois "is that the statute of limitations does not begin to run until the trial court enters a final judgment." *Praxair, Inc. v. Hinshaw & Culbertson*, 235 F.3d 1028, 1032 (7th Cir. 2000) (citing *Kaplan*, 153 F.3d at 420-21; and *Lucey*, 301 Ill. App. 3d 349). Monco does not dispute that if this "general rule" applied here it would dispose of his statute of limitations argument. The parties reached a tentative settlement in the underlying litigation in October 2016 and the court entered final judgment in March 2017; this suit was filed in September 2017.

Monco, however, argues for a different approach. He argues that on Zoltek's own theory of malpractice, Plaintiffs' decision to pursue an infringement case related to the F-22 based on the doctrine of equivalents injured Zoltek by delaying resolution of the case. Since the injury was delay (as opposed to an adverse ruling or judgment), final judgment was not necessary to actualize the injury. The rationale for the general rule is that it is often "too difficult to identify an earlier point at which [the malpractice plaintiff] can be said to have been injured." *Praxair*, 235 F.3d at 1032. A claim does not accrue until the plaintiff "incurs damages directly attributable to counsel's neglect." *Lucey*, 301 Ill. App. 3d 349, 353. Litigation is complicated, and it is hard to draw clear conclusions about which strategic choices caused aspects of the ultimate outcome. As the Seventh Circuit has put it,

> Was it when his lawyer failed to raise a dispositive defense in the answer to the complaint? When he failed to object to a crucial bit of evidence? When he fainted during final argument? To avoid these conjectures and

resulting uncertainty about when the statute of limitations began to run, the courts give the malpractice plaintiff two years from the date on which the trial court entered the final judgment against him in the suit that he claims his lawyer booted.

*Praxair*, 235 F.3d at 1032.

But these concerns do not apply equally to every case. Here, Plaintiffs' theory of injury potentially changes the analysis. Zoltek is not arguing that Plaintiffs could have achieved a better outcome on the F-22 claim if they had pursued a different theory or if they had not made mistakes. Instead, Zoltek argues that the F-22 claim had no merit at all. If this is true, then no subsequent court ruling or judgment was necessary to complete the injury. As soon as Plaintiffs began pursuing a claim based on the F-22, Zoltek incurred unnecessary legal expenses and proceedings were set in motion that prolonged the case with no upside.

In passing, Zoltek alludes to the idea that it suffered an aggregate injury, such that the injury was not complete until Plaintiffs completed their last act of representation in pursuit of the F-22 claim. *See* [353] at 17–18. But Zoltek does little to meaningfully develop this argument under Illinois law. "The court will not research and consider the details of defendant's argument where defendant has done little more than provide what would be an opening paragraph to a more properly framed argument." *Yeager v. Innovus Pharm., Inc.*, No. 18-cv-00397, 2019 WL 447743, at *9 (N.D. Ill. Feb. 5, 2019) (quoting *Dawson v. W. & H. Voortman, Ltd.*, 853 F. Supp. 1038, 1046 (N.D. Ill. 1994)); *see also United States v. Smith*, 26 F.3d 739, 743 (7th Cir. 1994) (courts need not research and construct legal arguments for parties). The only case Zoltek cites, *Mauer v. Rubin*, 401 Ill. App. 3d 630, 642, 926 N.E.2d 947, 957 (2010), dealt with the statute of repose, not the statute of limitations (the court discusses the statute of repose separately below). And Zoltek has not pointed to individual acts of malpractice after the decision to assert a claim based on the F-22 that added to Zoltek's injury.

As to damages, the general rule in Illinois requiring an adverse judgment or ruling reflects the fact that "damages are an essential element of a legal malpractice claim." *Constr. Sys., Inc. v. FagelHaber, LLC*, 2019 IL App (1st) 172430, ¶ 25, 123 N.E.3d 1189, 1196. Until injury occurs, the possibility of damages is often only speculative. But here, Zoltek argues that Plaintiffs' legal strategy caused delay, resulting in damages associated with the time value of money and additional legal expenses.[6] On this theory, damages accrued as the delay in litigation extended.

---

[6] As Illinois courts have noted, in some cases payment of attorney's fees can satisfy the damages element of a malpractice claim before the resolution of the case. *See Nelson v. Padgitt*, 2016 IL App (1st) 160571, ¶ 23, 66 N.E.3d 932, 937 ("[A] legal malpractice claim can accrue before an adverse judgment 'where an attorney's neglect is a direct cause of the

While the extent of the damages was uncertain until the case's resolution, damages are "speculative" only "if their existence is uncertain, not their amount." *Nelson v. Padgitt*, 2016 IL App (1st) 160571, ¶ 21, 66 N.E.3d 932, 937.  Relying on Zoltek's own legal theory, Plaintiffs' decision to pursue the F-22 doctrine of equivalents claim may or may not have injured Zoltek long before the case was resolved.  An earlier malpractice suit thus may or may not have violated "the admonishment against provisional or prophylactic legal malpractice cases." *FagelHaber*, 2019 IL App (1st) 172430, ¶ 27.

It is inherently difficult to identify a precise point in time when this type of injury occurred, since that requires an estimation of how long the litigation would have taken if Plaintiffs had not pursued the doctrine of equivalents theory.  But Zoltek itself appears to argue that but for Plaintiffs' pursuit of the F-22 claim, the litigation would have been resolved more than two years before this case began.  *See, e.g.*, [353] at 6 (arguing the F-22 claim "drastically delayed resolution" of the case).  On this record, a reasonable factfinder could conclude either way on the question of whether injury occurred early enough for Zoltek's claims to fall outside the limitation period.

## 2.    Discovery Rule

Even if Zoltek was injured and suffered damages at an early date, the statute of limitations did not begin to run until Zoltek either discovered or should have discovered that injury.  *Lucey*, 301 Ill. App. 3d 349, 353; *FagelHaber*, 2019 IL App (1st) 172430, ¶ 25 (statute of limitations does not run until injury occurs *and* the discovery rule is satisfied).  Often, malpractice does not become apparent or obvious until the case concludes.  However, as Illinois courts have put it, "[t]here may be rare cases in which it is painfully obvious, prior to any adverse ruling against the plaintiff client, that he has been injured as the result of professional negligence." *Warnock v. Karm Winand & Patterson*, 376 Ill. App. 3d 364, 372, 876 N.E.2d 8, 15 (2007); *see also Lucey*, 301 Ill. App. 3d 349, 358.

Judge Durkin previously denied Plaintiffs' motion to dismiss Zoltek's counterclaim on statute of limitations grounds, relying on the discovery rule. *Monco*, 2019 WL 952138, at *7.  Judge Durkin held that the counterclaim's allegations did not suggest that Zoltek either "knew of Plaintiffs' alleged malpractice as it occurred," or that "a diligent reasonable person should have known of or discovered Plaintiffs' acts earlier." *Id.*  Judge Durkin also observed that

---

legal expense incurred by the plaintiff.'") (quoting *Estate of Bass v. Katten*, 375 Ill. App. 3d 62, 70, 871 N.E.2d 914 (2007)).  However, this is only true where it is already "clear" that that "the fees are directly attributable to former counsel's neglect."  *Lucey v. Law Offices of Pretzel & Stouffer, Chartered*, 301 Ill. App. 3d 349, 355, 703 N.E.2d 473, 478 (1998).

"subsequent discovery may reveal a basis to do so later in any event. By way of example, discovery may reveal that Zoltek had information in 2009 that called into doubt Plaintiffs' performance, thus causing it to engage another firm, and triggering the statute of limitations." *Id.*

With the benefit of discovery, the parties now return to this issue in their motions for summary judgment. "The time at which a party has or should have the requisite knowledge under the discovery rule to maintain a cause of action is ordinarily a question of fact." *Jackson Jordan, Inc. v. Leydig, Voit & Mayer*, 158 Ill.2d 240, 250, 633 N.E.2d 627 (1994). Summary judgment is therefore only appropriate if a reasonable factfinder could only come to one conclusion.

Neither party has cited any cases applying the discovery rule to a case like this one—where rather than arguing attorney negligence caused the loss of a *meritorious* claim, the plaintiff asserted that attorney negligence resulted in the unnecessary prosecution of a *meritless* claim, even though the litigation ultimately resulted in a favorable outcome for the plaintiff. Ultimately though, the inquiry is the same: when should Zoltek have discovered Plaintiffs' alleged malpractice? *See FagelHaber*, 2019 IL App (1st) 172430, ¶ 27 (distinguishing cases that "all have the common thread that the attorney's negligence could not have reasonably been discovered before the trial court entered an adverse judgment").

Zoltek does not argue that an adverse ruling—or the mediation, settlement, or judgment—revealed any problems with the F-22 doctrine of equivalents theory. Instead, it argues that Plaintiffs' malpractice became apparent for the first time after it consulted with new patent counsel in 2016. Monco argues that Zoltek either discovered or should have discovered its injury much earlier than that.

Monco relies on *Nelson v. Padgitt*, 2016 IL App (1st) 160571, ¶ 22, 66 N.E.3d 932, 937. There, the court found it was "plainly obvious" that the plaintiff, a "sophisticated businessperson eventually assisted by a new attorney," had been injured by his attorneys' negotiation of an employment agreement. *Id.* After the plaintiff's employer fired him, it was obvious that the employment agreement "did not include the economic protections" he allegedly told his attorney to include. *Id.* The plaintiff subsequently sued his former employer for breach of contract, but he "did not need the trial court's adverse judgment to know that he had been harmed" by the attorney who drafted the contract. *Id.* The court also found that "the connection between the financial loss" associated with litigating the breach of contract action and the attorney's negligence was not "faint or too complex for a layman to grasp." *Id.* ¶ 23. This case presents a different issue than *Nelson*, since Zoltek argues that Plaintiffs' conduct during the litigation was malpractice, as opposed to the separate conduct preceding the litigation that formed the basis of the claim in *Nelson*.

Further, in both *Nelson* and *Carlson v. Fish*, 2015 IL App (1st) 140526, ¶ 36, 31 N.E.3d 404, 414, which Monco also cites, the malpractice claims were "inseparable" from another wrongful cause of injury that triggered a duty to inquire. In *Nelson*, the plaintiff's firing inherently suggested that the employment contract negotiated by the plaintiff's attorney did not include adequate protections. 2016 IL App (1st) 160571, ¶ 22. In *Carlson*, the plaintiff knew his partners engaged in fraud, raising the "inseparable" issue of whether the defendant attorneys "failed to protect him" from that fraud. 2015 IL App (1st) 140526, ¶ 39. Zoltek argues that in this case, there was no specific wrongfully caused adverse event that could have put it on notice of potential malpractice.

In response, Monco points to evidence that Zoltek was frustrated with Plaintiffs' general handling of the case and believed that Plaintiffs' litigation strategies had prolonged the litigation and risked losing the claims. Monco argues that Zoltek's unhappiness with many of Plaintiffs' choices during the litigation triggered Zoltek's duty to look into whether Zoltek had a malpractice claim, including on grounds of which Zoltek was not already aware. The court summarizes this evidence below.

### *2009 Developments*

Monco first points to correspondence with Zsolt Rumy, Zoltek's CEO.[7] Rumy's knowledge is imputed to Zoltek for purposes of this analysis. *See Blue Water Partners, Inc. v. Edwin D. Mason, Foley & Lardner*, 2012 IL App (1st) 102165, ¶ 52, 975 N.E.2d 284, 298 (noting that "knowledge of a corporate officer is imputed to the corporation") (citing *Metropulos v. Chicago Art Glass, Inc.*, 156 Ill.App.3d 727, 740, 109 Ill. Dec. 229, 509 N.E.2d 1068 (1987)).

On October 3, 2009, Rumy sent an email to Monco that included the following:

> More [*sic*] I think about this situation, more [*sic*] I am convinced that we need to be in the position that we have a winning litigator leading the negotiations with Lockheed. We need to put them in a position of losing the case [*sic*] is a real possibility. As for dealing with Lockheed's potential recovery of ant [*sic*] settlement moneys is not our concern. Further, even worse, it would look like collusion for us to support and/or promote their recovery from the government. Therefore, my recommendation is to transfer the case to Martin Green to handle the litigation and negotiations.

---

[7] In a previous order in this case, Judge Durkin dismissed Rumy as an individual defendant. *See Monco*, 397 F. Supp. 3d at 1173.

[325] ¶ 21.  On October 19, 2009, Rumy sent Monco another email:

> Since your e-mail I had a chance to talk to Martin this weekend and I had some time to reflect about the case that has been in progress for 13 years. There are many things that concern me - we spent over $500,000 and you have spent much time. However, we lost at every turn. Now we are basically [sic] back to where we started, one more brief separating us from potentially loosing [sic] the F-22 and left with the B-2. Your proposed scheme to use Senator McCaskill to change the law or to propose support to have the government pay Lockheed's settlement is the final straw for me. I believe we need to change direction immediately before we lose this case completely. It is too important for Zoltek!

[325] ¶ 22.  In 2011, Rumy also said that "starting in early 2009 after several adverse actions . . . it became clear to me that [Monco] ran out of steam and ideas to proceed."  [325] ¶ 26.  And during his deposition in this case, Rumy further testified that in 2009, he believed that Monco and Mortimer had done "a lousy job" with the case.  [325] at 23.

This evidence demonstrates that an accumulation of developments in the litigation brought Plaintiffs' litigation choices to Zoltek's attention.  For statute of limitations purposes, the question is whether Zoltek's knowledge of Plaintiffs' track record and litigation strategies as of 2009—coupled with a belief that Plaintiffs had done a lousy job and needed "to change direction immediately" to save the case—shows it was "plainly obvious" that Zoltek had been "injured as the result of professional negligence" or that Plaintiffs' neglect directly caused Zoltek's legal expenses.  *Nelson*, 2016 IL App (1st) 160571, ¶ 14.

Zoltek argues that while it was frustrated with the lack of progress, it never criticized Plaintiffs' legal theory of infringement for the F-22.  But Zoltek was not required to have "actual knowledge of the alleged malpractice" for the statute of limitations to begin running.  *Carlson v. Fish*, 2015 IL App (1st) 140526, ¶ 23. A party has the burden of inquiring further once the party "knows or reasonably should know both of his injury and that it was wrongfully caused."  *Id.*  This discovery rule "has been interpreted to delay commencement until the person has a reasonable belief that the injury was caused by wrongful conduct thereby creating an obligation to inquire further on that issue."  *Dancor Int'l, Ltd. v. Friedman, Goldberg & Mintz*, 288 Ill. App. 3d 666, 673, 681 N.E.2d 617, 622 (1997); *see also Carlson*, 2015 IL App (1st) 140526, ¶ 23; *Blue Water Partners, Inc. v. Edwin D. Mason, Foley & Lardner*, 2012 IL App (1st) 102165, ¶ 51, 975 N.E.2d 284, 298; *Brummel v. Grossman*, 2018 IL App (1st) 162540, ¶ 26, 103 N.E.3d 398, 409.

The question then is whether Zoltek reasonably believed that Plaintiffs wrongfully caused its claimed injury—here, the delay or lack of progress—creating

14

an obligation to inquire further into Plaintiffs' legal theories. This standard is satisfied when the injured party "possesses sufficient information concerning an injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved." *Carlson*, 2015 IL App (1st) 140526, ¶ 23.

The evidence is inconclusive as to whether Zoltek had enough information about Plaintiffs' handling of the litigation in 2009 to develop significant cause for concern about malpractice. Rumy felt that Plaintiffs had done "a lousy job" and that Plaintiffs' strategies to date had been unsuccessful and had cost Zoltek "over $500,000" and "much time." [325] ¶¶ 22, 23. He also felt that Plaintiffs' proposals (including to seek political intervention) were the "final straw," leading him to conclude that "we need to change direction immediately" to avoid losing the case. [325] ¶ 22. Zoltek's general concerns related to issues that did not clearly point to malpractice, especially arising out of Plaintiffs' doctrine of equivalents theory of F-22 infringement. The 2009 evidence is insufficient to support summary judgment in any party's favor.

### Green Jacobsen Representation

Monco also argues that Zoltek's engagement of Green Jacobsen in 2009 was an attorney consultation that should have put the company on actual notice of any malpractice. Martin Green appeared as lead counsel for Zoltek before the Court of Federal Claims in November 2009 and withdrew his appearance in October 2011. [325] ¶¶ 24, 29.

The involvement of other attorneys does not automatically trigger a duty to inquire as to potential malpractice claims. Monco relies on *Barratt v. Goldberg*, 296 Ill. App. 3d 252, 694 N.E.2d 604 (1998), but there the plaintiff alleged that when her second attorney advised her, she "became aware of [the defendant's] alleged negligent representation." *Id.* at 254. Thus, the plaintiff "actually knew of her cause of action within the limitations period." *Id.* at 258. Nor is this a case where the very premise of the new attorneys' actions made the original attorney's negligence clear. *See Constr. Sys., Inc. v. FagelHaber, LLC*, 2019 IL App (1st) 172430, ¶ 25, 123 N.E.3d 1189, 1197 (noting that if law firm had "properly perfected Construction Systems' [the client's] mechanic's lien," there "would have been no need for Berres [substitute counsel] to develop alternative arguments to attempt to preserve the priority of the lien").

One reason Zoltek hired Green Jacobsen in 2009 was Zoltek's belief that Green Jacobsen could resolve the case more quickly than Plaintiffs could. Rumy testified that as a result of his dissatisfaction with Plaintiffs' strategy, he spoke with Martin Green of Green Jacobsen in order "to get the appeal done and that's it."

15

[325] ¶ 23.[8] Yet Green Jacobsen apparently continued litigating the allegedly meritless F-22 claim.

The evidence does not sufficiently show that Green Jacobsen's involvement (to whatever extent it occurred) put Zoltek on notice to inquire into potential malpractice claims against Plaintiffs. Zoltek claims that Green Jacobsen served only as co-counsel and continued to rely on Plaintiffs for patent advice. Monco disputes this characterization and points out that Rumy testified that after Zoltek substituted Martin Green as lead counsel, Plaintiffs "decided that they quit, and that's it." [325] ¶ 23. But neither party cites any authority suggesting that the extent of Plaintiffs' continuing involvement in the case makes a difference to this analysis. Plaintiffs have not pointed to evidence suggesting that Green Jacobsen raised any flags about Plaintiffs' litigation strategies.[9]

*2014 Developments*

Finally, Monco cites evidence to show Zoltek was also on notice of any alleged malpractice in 2014. In May of that year, following a trial and adverse ruling from the Court of Federal Claims, Rumy wrote Monco a letter. Among other things, he wrote: "Our case against the US government has gone on for over 16 years and now we find ourselves essentially nowhere." [325-6] at 1. Rumy saw "no future in spending more of my time or Zoltek's money to pursue this further," told Monco to pursue the appeal process "on your own," and indicated that he "should consider the serious overpayment as your compensation for the appeal process." [325] ¶ 34. The parties communicated further about the appeal process, future of the case, and their dispute about fees. In November, Rumy stated in an email that "you two are jerks, but even more, not only incompetent but also dishonest. . . . Please understand that I will also be preparing a claim against your firm to refund approximately $290,000 unauthorized expenses Zoltek paid to the Greenberg law firm in Washington DC. . . . I will be engaging an attorney to represent Zoltek and myself to protect our interest and enforce our claims against you and your law firm." [325] ¶ 38.

Zoltek argues that these communications do not show that Zoltek should have known about Plaintiffs' alleged malpractice in 2014. It contends that these communications concerned a separate dispute over fees and whether Plaintiffs could properly seek ownership of Zoltek's claims if Zoltek discontinued the representation under the agreements governing the representation. As with the 2009

---

[8] This appeal was different from the 2014 appeal mentioned above. [325] at 4 ¶¶ 16–17.

[9] Zoltek also argues Green Jacobsen was not "capable of recognizing the erroneousness of Plaintiffs' DOE [doctrine of equivalents] theory" since its attorneys had insufficient patent law experience. [353] at 10. Zoltek, however, does not support this claim with any record evidence.

communications, Zoltek did not criticize Plaintiffs' doctrine of equivalents theory or pursuit of the F-22 claim.

Nonetheless, Monco argues that this dispute again triggered Zoltek's duty to inquire. Monco relies on *Carlson*. There, the court pointed to a "trail of emails" which showing that the plaintiff was dissatisfied with his attorneys' performance. 2015 IL App (1st) 140526, ¶ 38, 31 N.E.3d 404, 414. But the facts of *Carlson* were much simpler. The plaintiff knew that he was injured by an agreement negotiated at a mediation, and the emails showed he "was not happy with his attorneys' representation in the mediation." *Id.* The emails showed dissatisfaction with the very acts of representation that formed the basis of the plaintiff's claims against the attorneys. *See also Anderson v. Kuzniewski*, 2019 IL App (2d) 190020-U, ¶ 34 (plaintiff's "extreme dissatisfaction with the settlement necessarily implied dissatisfaction with defendant's performance"). Here, the 2014 communications primarily concern discrete issues, including a fee dispute, that were separate from the actions underlying Zoltek's present claim.

The sheer length of the litigation means that there was a long period of time in which Zoltek could have discovered the malpractice claim. At the same time, the length could be explained by the complexity of the litigation. And it is difficult to assess whether and if so when Zoltek knew or must have known of the malpractice claim without understanding the merits of the underlying litigation, which are complex and have not been briefed. The complexity of the underlying litigation cuts against summary judgment on whether and if so when Zoltek knew or must have known of the malpractice claim.

Considering all the evidence put forth by the parties, a reasonable factfinder could come to more than one conclusion about whether Zoltek should have discovered Plaintiffs' alleged malpractice before the underlying litigation was resolved. Zoltek's theory is that Plaintiffs pursued a meritless legal claim from the start that caused the litigation to take significantly longer than it should have. Undoubtedly the length of the litigation was extraordinary compared to an average lawsuit; but the litigation was also very complex and it is unclear whether the length was extraordinary given the complexity. The evidence shows that Zoltek was aware of the litigation's length and at various points expressed dissatisfaction, even strong dissatisfaction, with Plaintiffs' strategies. In hindsight it could well have been prudent to seek a second opinion somewhere along the way during 20 years of litigation. But it is less clear that any of these events sufficiently put Zoltek on notice of potential malpractice, especially given the complexity of the case. The undisputed facts do not conclusively determine one way or the other whether Zoltek had "a reasonable belief that the injury was caused by wrongful conduct thereby creating an obligation to inquire further on that issue." *Dancor*, 288 Ill. App. 3d at 673, 681 N.E.2d at 622; *see also Carlson*, 2015 IL App (1st) 140526, ¶ 23.

17

In sum, since a reasonable factfinder could find in either party's favor on the timeliness issue, both motions for summary judgment are denied as to the statute of limitations defense. The court does not reach Zoltek's additional arguments based on equitable estoppel and equitable tolling.

## C.    Statute of Repose

While Monco's motion only seeks summary judgment on statute of limitations grounds, Plaintiffs have also pled a statute of repose defense and Zoltek moves for summary judgment on that defense as well.

The parties agree that the statute of repose applicable to Zoltek's claims provides that an action "may not be commenced in any event more than 6 years after the date on which the act or omission occurred." 735 ILCS 5/13-214.3(c). They dispute when the 6-year period began.

Judge Durkin addressed this issue in his February 27, 2019 order. As Judge Durkin explained: "Illinois law makes clear that the statute of repose is not automatically tolled because the attorney-client relationship is ongoing." *Monco*, 2019 WL 952138, at *7 (citing *Mauer v. Rubin*, 401 Ill. App. 3d 630, 640, 926 N.E.2d 947, 956 (2010)). Instead, the period of repose generally "'begins to run on the last date on which the attorney performs the work involved in the alleged negligence.'" *Id.* (quoting *Fricka v. Bauer*, 309 Ill. App. 3d 82, 86, 722 N.E.2d 718, 722 (1999)).

Here, the parties rehash their arguments from the earlier motion to dismiss. Zoltek argues that Plaintiffs' pursuit of the F-22 claim was malpractice, and Plaintiffs continued to pursue that claim until they were terminated in 2016, meaning that the malpractice continued until that point. Monco responds that the relevant act was instead the initial decision to pursue the F-22 claim, and decades have passed since then.

As Judge Durkin explained, Illinois law is not clear on whether a so-called "continuous course of negligent representation theory" is available for legal malpractice claims. *Monco*, 2019 WL 952138, at *8. In *Mauer*, 401 Ill. App. 3d 630, the court declined to reach the issue, but noted that if it was available, such a claim would require a "cumulative" injury where "each negligent treatment adds to the harm suffered by plaintiff, independently worsening the injury. *Id.* at 641. With respect to the motion to dismiss, Judge Durkin concluded:

> From these allegations, the Court is unable to conclude when the statute of repose commenced. Zoltek seems to plead a continuous course of negligent representation theory that results in injury which is 'cumulative' or 'aggregate' in nature, pointing to delayed settlement of the Stealth litigation and excessive fees and costs incurred. While

Illinois courts have questioned the viability of this doctrine, the Court is not prepared to say at this stage that it is unavailable here, particularly where there is no 'single overt act' to point to from which injury flows, and where Zoltek alleges the malpractice continued up until Plaintiffs' termination in 2016.

*Monco*, 2019 WL 952138, at *8.

As Monco notes, Zoltek's malpractice theory has narrowed from the broader set of allegations in the counterclaim; Zoltek now relies solely on Plaintiffs' pursuit of the F-22 claim. Yet Zoltek's present theory still involves a cumulative or aggregate injury and continuing acts of negligence. As before, the court is unable to conclusively determine that Illinois law bars this theory.

Monco again relies on *Lamet v. Levin*, 2015 IL App (1st) 143105, 39 N.E.3d 136. In that case, the plaintiff's "primary contention" was that his attorney "acted negligently in 1994 by failing to advise him of his lack of any meritorious defenses and in filing pleadings asserting defenses and counterclaims that were not well-founded in fact." 39 N.E.3d at 142. Since the failure to advise in 1994 was the basis of the claim, the statute of repose began then notwithstanding subsequent pursuit of the ill-founded claims for 17 years. *Id.* at 141.

In the earlier order, Judge Durkin distinguished *Lamet*, noting that Zoltek did not allege that "Plaintiffs knew or reasonably should have known from day one of the lengthy and complex patent litigation that Zoltek's infringement theory was devoid of merit," and "the injury and conduct complained of are far more complex here." *Monco*, 2019 WL 952138, at *9. At this stage, it remains unclear whether the injury boils down to the original decision to pursue the F-22 claim, or whether the injury and alleged malpractice spanned a different or lengthier period of time.

Nonetheless, it is Zoltek's burden in seeking judgment to show that no reasonable factfinder could decide that the statute of repose began more than six years before Zoltek brought its claims. Reading the cases discussed above together, the court cannot determine when the period of repose began without a fuller picture of the alleged malpractice. Zoltek has not shown that no reasonable factfinder could decide that the key decisions setting the F-22 claim in motion all occurred early enough to bar Zoltek's claims. The court thus denies Zoltek's motion for summary judgment on Plaintiffs' statute of repose defense.

### D. Plaintiffs' Additional Affirmative Defenses

Zoltek also moves for summary judgment on Plaintiffs' two remaining affirmative defenses, which assert that Plaintiffs' "conduct is not the actual or proximate cause of any injury to Zoltek, including injuries alleged in the

counterclaim," and "Zoltek's claimed injury is wholly or partly attributable to negligence of Zoltek's own agents and attorneys." *See* [258] at 10–11; [262] at 11. Zoltek argues that there is no evidence in the record to support these defenses.

In response, Monco simply asserts that the "contributory-negligence and intervening-cause defenses are viable." Without much elaboration, he notes that Green Jacobsen pursued the same F-22 doctrine of equivalents claim that Plaintiffs pursued, and argues that to the extent that the pursuit of that theory was negligent, Zoltek bears responsibility for hiring counsel who also pursued that negligent theory. *See* [378] at 20.

Summary judgment is the "put up or shut up moment in a lawsuit when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Because Zoltek moved for summary judgment on these affirmative defenses, Plaintiffs must come forward with any material facts that could convince a factfinder they should prevail on these defenses. *See Johnson*, 325 F.3d at 901.

While Monco's response is underdeveloped, the court cannot conclude that summary judgment is appropriate on this record. Neither party has moved for summary judgment on the merits of Zoltek's claim. Without any evidence about whether Plaintiffs wrongfully injured Zoltek through pursuit of the F-22 claim, the court cannot conclude as a matter of law that Zoltek was not contributorily negligent or that Green Jacobsen's actions were not an intervening cause of this injury. Zoltek's motion is denied as to these defenses as well.

## II.  Plaintiffs' Quantum Meruit Claim

The court turns next to the parties' arguments about Plaintiffs' claim for attorneys' fees. The court addresses in turn (1) Zoltek's affirmative defenses, and (2) Zoltek's motion on the issue of quantum meruit calculation.

### A.  Zoltek's Affirmative Defenses

Among other affirmative defenses to Plaintiffs' complaint, Zoltek asserts professional negligence (defense two), breach of fiduciary duty (defense three), and unclean hands (defense five). *See* [243] at 27–30. These defenses expressly incorporate Zoltek's counterclaims and appear to rest on identical factual allegations. For the same reasons discussed above, Monco seeks summary judgment on these defenses on statute of limitations grounds. Zoltek seeks summary judgment on the issue of whether these defenses—as distinct from the counterclaims—are subject to the statutes of limitations or repose.

Zoltek's professional negligence and breach of fiduciary duty defenses are not proper affirmative defenses. Zoltek cites *Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149 (2d Cir. 2003), where the court held that a "defendant who is not seeking any affirmative relief and who asserts a defense only to defeat a plaintiff's claim is not barred by a statute of limitations." *Id.* at 163. But an affirmative defense must destroy a right of action. *See Karum Holdings LLC v. Lowe's Companies, Inc.*, No. 15-cv-00380, 2017 WL 5593319, at *3 (N.D. Ill. Nov. 21, 2017) (quoting *Ace Hardware Corp. v. Marn, Inc.*, 2008 WL 4286975, at *8 (N.D. Ill. Sep. 16, 2008)), *aff'd*, 895 F.3d 944 (7th Cir. 2018). Zoltek has not cited any authority that suggests as a matter of substantive law that if Plaintiffs were professionally negligent or breached their fiduciary duty, they are unable to pursue a quantum meruit claim for attorneys' fees.

These are only "defenses" in the sense that Plaintiffs' own liability for professional negligence or breach of fiduciary duty could offset Zoltek's liability for fees. Accordingly, Zoltek's professional negligence and breach of fiduciary duty defenses do seek "affirmative relief," and are properly subject to the statute of limitations. *Estate of Burne Hogarth*, 342 F.3d at 163. This type of "setoff" defense is properly pled as a counterclaim, not an affirmative defense. *See Coplay Cement Co. v. Willis & Paul Grp.*, 983 F.2d 1435, 1440 (7th Cir. 1993) ("as a procedural device the setoff has been supplanted by the permissive counterclaim"); *Levin v. Abramson*, No. 18-cv-01723, 2020 WL 2494649, at *14 (N.D. Ill. May 13, 2020) ("Since an affirmative defense for setoff has no distinct procedural value, the court strikes this defense for clarity."); *Ace Hardware*, 2008 WL 4286975, at *8 ("A claim for setoff or recoupment is not technically a 'defense' at all, but must be plead as a counterclaim pursuant to Rule 13."). These defenses should be and were in fact pled as counterclaims.

As to Zoltek's fifth defense, "unclean hands," neither party has carried its burden of showing it is entitled to summary judgment on the timeliness issue. And while Monco argues this is not a proper affirmative defense, he has not developed any arguments about the circumstances in which the doctrine of unclean hands could preclude a quantum meruit claim for attorneys' fees. The court therefore denies both cross motions as to this defense.

## B.    Quantum Meruit Calculation

Zoltek also moves for summary judgment on the issue of how any quantum meruit award in this case would be calculated. The parties do not dispute that Zoltek fired Plaintiffs before the litigation settled. Nor do they dispute that "[w]hen a client fires an attorney who was retained on a contingency fee contract, that contract ceases to be effective and the attorney can no longer recover under it." *Dobbs v. DePuy Orthopaedics, Inc.*, 885 F.3d 455, 457 (7th Cir. 2018) (citing *Thompson v. Buncik*, 2011 IL App (2d) 100589, ¶ 8, 961 N.E.2d 280, 283 (Ill. App.

Ct. 2011)); *see also In re Estate of Callahan*, 144 Ill.2d 32, 40, 578 N.E.2d 985 (1991). Instead, Plaintiffs seek "a reasonable sum for services rendered based on quantum meruit ('as much as he deserves')." *Dobbs*, 885 F.3d at 457–58.

Zoltek argues that on this record, only certain methods of calculation are appropriate as a matter of law. It contends that (1) Plaintiffs are not "entitled to a contingency fee identified in retainer agreements" and (2) "any quantum meruit award here should be based on hours reasonably worked multiplied by a reasonable hourly rate." [370] at 8. Zoltek paints a picture of Illinois law in which Illinois courts "generally apply the lodestar method" in quantum meruit cases and there is a narrow "exception" for cases where the attorney was fired on the eve of settlement. Plaintiffs dispute this characterization of Illinois law, arguing that the lodestar method is not required and that the factfinder can properly rely on the contingency agreement to determine the value of their quantum meruit claim.

The parties agree that to determine a "reasonable fee for services rendered, Illinois courts consider 'the time and labor required, the attorney's skill and standing, the nature of the cause, the novelty and difficulty of the subject matter, the attorney's degree of responsibility in managing the case, the usual and customary charge for that type of work in the community, and the benefits resulting to the client.'" *Id.* at 458 (quoting *Will v. Nw. Univ.*, 378 Ill. App. 3d 280, 881 N.E.2d 481, 504–05 (Ill. App. Ct. 2007)); *Callahan*, 144 Ill. 2d at 44, 578 N.E.2d at 990. All the Illinois cases cited by the parties make clear that any quantum meruit fee award in this case must be determined in accordance with these factors.

This dispute boils down to how, as a matter of law based on the undisputed facts in this contingent-fee arrangement case, the factfinder must calculate a reasonable fee.

Zoltek contends that two Illinois Supreme Court cases establish that factfinders cannot consider contingency fee contracts to determine the value of a *quantum merit* claim: *Rhoades v. Norfolk & W. Ry. Co.*, 78 Ill. 2d 217, 399 N.E.2d 969 (1979), and *In re Estate of Callahan*, 144 Ill. 2d 32, 578 N.E.2d 985 (1991).

In *Rhoades*, the Illinois Supreme Court reversed a decision awarding an attorney the "25% contingent fee provided for in the retainer agreement," where the client terminated the agreement shortly after entering it, and subsequently settled the underlying claim himself. 78 Ill. 2d at 226. The court held that instead of the contract fee, the attorney in that case was "entitled to be paid on a quantum meruit basis a reasonable fee for services rendered before discharge," and remanded for a determination of that fee. *Id.* at 230. In doing so, the court relied on a California Supreme Court opinion which held, among other things, that "in cases in which an attorney who has done much work is fired immediately before a settlement is reached, the factors involved in determining a reasonable fee would justify a finding

that the entire contract fee is the reasonable value of services rendered." *Id.* (describing *Fracasse v. Brent*, 6 Cal. 3d 784, 494 P.2d 9 (1972)).

In *Callahan*, a client fired a law firm that was representing her in a lawsuit on a contingent-fee basis. 144 Ill. 2d at 35. Before the suit was resolved, an attorney brought a claim for fees (the firm had assigned its claim to the attorney) and prevailed. *Id.* The Illinois Supreme Court affirmed the award and held that a "cause of action for a quantum meruit fee accrues immediately after discharge." *Id.* at 40. The court reached this conclusion in part because the "outcome of the litigation is not an indispensable element that must be considered in calculating the value of an attorney's services." Quantum meruit analysis includes looking to the "benefits that have resulted to the client from the attorney's representation." *Id.* at 41. Moreover, this analysis is possible before resolution of the underlying claim, since the "value of one attorney's services is not measured by the result attained by another." *Id.* (quoting *In re Tillman*, 259 N.Y. 133, 135-36 181 N.E. 75, 76 (1932)). The court also observed that after discharge, "the former client will not be liable for the entire contract fee. Instead, the former client will only be liable for the reasonable value of the services received during the attorney's period of employment." *Id.* Ultimately, the court affirmed the fee award, which was based in part on testimony that the "customary hourly rate in the community was $100." *Id.* at 45.

*Rhoades* and *Callahan* do not go as far as Zoltek claims. Unlike here, in *Callahan* the underlying claim had not been resolved yet. As a result, no contingency calculation was even possible. The court held that in such a situation, an award based on the quantum meruit factors that included reference to the customary hourly rate was appropriate. The court did not rule out reference to a contingent agreement in other situations. To the contrary, *Rhoades* suggested that a full contingent award could be reasonable in at least some circumstances. Neither case sets forth a bright-line rule regarding whether and when courts can rely on contingent fee provisions to determine the value of a reasonable quantum meruit fee. Thus, the court must attempt to "predict how the Illinois Supreme Court would decide the issue," examining "decisions of the lower state courts to help formulate an answer." *Kaplan v. Shure Bros.*, 153 F.3d 413, 420 (7th Cir. 1998).

Relying on *Rhoades*, Illinois courts have held that "where an attorney who has done much work is fired immediately before settlement is reached, these factors involved in determining a reasonable fee 'would justify a finding that the entire contract fee is the reasonable value of services rendered.'" *Will v. Nw. Univ.*, 378 Ill. App. 3d 280, 304, 881 N.E.2d 481, 505 (2007) (quoting *Wegner v. Arnold*, 305 Ill. App. 3d 689, 693, 713 N.E.2d 247 (1999)). In *Will*, the court affirmed a quantum meruit award in a contingent fee arrangement case that consisted of "the entire one-third contracted fee." 378 Ill. App. 3d 280, 305, 881 N.E.2d 481, 505. Other courts have affirmed awards consisting of the "contingent fee less the fees allocable

to [the subsequent attorney]." *DeLapaz v. SelectBuild Const., Inc.*, 394 Ill. App. 3d 969, 975, 917 N.E.2d 93, 98 (2009); *see also Wegner v. Arnold*, 305 Ill. App. 3d 689, 694, 713 N.E.2d 247, 251 (1999) (finding "no language in [*Rhoades* or *Fracasse*] implying that an award of contract fees to a discharged attorney as quantum meruit is limited only to cases where the amount of work done from an hourly fee standpoint is roughly equal to the contract fee"). Based on *Will*, the Seventh Circuit has affirmed the district court's conclusion "that the *quantum meruit* factors weighed in favor of awarding . . . the entire contract fee as the reasonable value of services rendered." *Dobbs*, 885 F.3d at 459 (citing *Will*, 881 N.E.2d at 505).

Zoltek also argues that at most, these cases establish a narrow "eve of settlement" exception that does not apply in this case. This argument has some force, to the extent that a full contingent fee award is only a reasonable sum for services rendered when the settlement is almost entirely attributable to the attorney's work. *See DeLapaz*, 394 Ill. App. 3d at 976 (describing contingent fee award as an "exception to the general rule" in a quantum meruit case); *Dobbs v. DePuy Orthopedics, Inc.*, 842 F.3d 1045, 1050 (7th Cir. 2016) (the rule of Illinois law that would justify "finding that the entire contract fee is the reasonable value of services rendered" applies when the attorney did "much work," under the quantum merit factors) (quoting *DeLapaz*, 394 Ill. App. 3d at 976).

However, Illinois courts have used a contingent fee calculation when the subsequent attorney did valuable work as well. For example, in *Wegner*, the court held that the fired attorney should receive the contingent amount minus the fees owed to the successor attorney, and instructed that "in assessing the fees to be awarded the successor attorneys, the trial court should consider, among other factors, that the successor attorneys benefitted the client by negotiating the reduction of two liens placed on the lawsuit." 305 Ill. App. 3d at 697, 713 N.E.2d at 253. Zoltek cites no authority suggesting a bright-line rule about when contingent rates may be considered pursuant to the quantum meruit factors.

Moreover, the lodestar method, or "the product of reasonable hours times a reasonable rate," *Murphy v. Smith*, 138 S. Ct. 784, 789 (2018), is not the only alternative to applying the percentage in the contingency agreement itself to the value of the settlement. The ultimate question is the value of "a reasonable sum for services rendered," or "as much as [the attorney] deserves." *Dobbs*, 885 F.3d at 457–58. Courts may consider generally employed contingent-fee percentages rather than only hourly rates in determining the "usual and customary charge." In *Dobbs*, the court noted that the plaintiff pointed "to no Illinois case employing the lodestar method in a quantum meruit, contingency-fee case like the one here, let alone one requiring it." *Id.* n.2; *see also Baker v. City of Granite City*, 112 Ill. App. 3d 1096, 1099, 446 N.E.2d 531, 533 (1983) ("The court correctly concluded that the usual and customary fee in the community can be expressed as a percentage.")

To be sure, other courts have found that multiplying time by a reasonable hourly rate is a better approach in cases where the full contingent fee would not be reasonable, or an apportionment of a contingent fee would be difficult. *See, e.g.*, *Johns v. Klecan*, 198 Ill. App. 3d 1013, 1021, 556 N.E.2d 689, 694 (1990). However, that approach still requires analysis of factors other than labor and the prevailing rate. *Id.* at 1019 ("[T]he time and labor required in a case is but one factor to be considered in determining a reasonable attorney fee under the doctrine of quantum meruit."). To the extent Zoltek is arguing otherwise by pressing a "lodestar" methodology, it is incorrect.

Zoltek also cites *Vance v. Gallagher*, No. 02-cv-08249, 2006 WL 2460611 (N.D. Ill. Aug. 21, 2006). There, the court found that the "circumstances of this case are simply not the sort contemplated by the Illinois Supreme Court in *Rhoades* when it speculated that the factors involved in determining a reasonable fee may justify a finding that the entire contract fee is the reasonable value of services rendered by a discharged attorney." *Id.* at *5. After an extensive analysis of those factors, the court determined instead that "a quantum meruit recovery of a reasonable hourly fee multiplied by the reasonable number of hours spent on the case" was appropriate. *Id.* at *6. Significant legal work occurred both before and after the engagement in question, and the court found that the client derived "at most a marginal benefit." *Id.* at *4. Additionally, the fee agreement between the parties specified that in the event of termination, compensation would be determined using a flat hourly rate. The court found that this provision was "an important factor that should have been considered . . . in [the parties'] assessment of the reasonable value of services rendered." *Id.* at *5. Thus, *Vance* shows that courts may look to the underlying fee agreement to conduct a quantum meruit analysis, even when the attorney was not fired on the eve of settlement. *Id.* at *3.

Zoltek's motion asks the court to decide "that Plaintiffs were not on the eve of settlement when fired and that Plaintiffs cannot link any recovery to a contingency fee." [370]. Based on the principles of Illinois law explained above, the court denies that request. First, courts may consider agreements between the parties as relevant evidence in a multi-factor quantum meruit analysis. *See Vance*, 2006 WL 2460611, at *6. Second, the question of whether to calculate a reasonable fee with reference to a contingent fee or instead use a reasonable hourly rate is part of the larger multi-factor quantum meruit analysis. *See Dobbs*, 885 F.3d at 459 ("[T]he district court appropriately concluded that the quantum meruit factors weighed in favor of awarding McLaughlin the entire contract fee as the reasonable value of services rendered."). The court thus rejects the premise that a contingency fee agreement can only be considered if Plaintiffs make a threshold showing that they were fired on the "eve of settlement." When Illinois courts have awarded full contingent fees in cases involving the "eve of settlement," they have done so because they found that was a reasonable quantum meruit award considering all the required factors. *See Will*, 378 Ill. App. 3d at 304, 881 N.E.2d at 505; *Wegner*, 305

Ill. App. 3d at 693, 713 N.E.2d at 251; *DeLapaz*, 394 Ill. App. 3d at 975, 917 N.E.2d at 98 (2009).  Since Zoltek relies solely on evidence that Plaintiffs were not on the "eve of settlement" when fired, and does not address other aspects of the analysis, it has not carried its burden at summary judgment.  Zoltek has not attempted to point to facts in the record that could establish the reasonable value of a quantum meruit award as a matter of law, nor has it asked the court to conduct a full analysis.

Additionally, to the extent that Zoltek seeks as a matter of law to rule out an award equal to the full contingent entitlement under the parties' contracts (as opposed to any award calculated with reference to a contingent figure but somehow modified), it has not carried its burden of showing that no reasonable factfinder could decide such an award is a "reasonable sum for services rendered" on the basis of the undisputed facts.  *Dobbs*, 885 F.3d at 457–58.

Again, Zoltek focuses on the case's lack of proximity to settlement when Plaintiffs were fired, focusing on the following evidence: On March 11, 2016, Plaintiffs wrote a memorandum to Zoltek that, among other things, expressed the view that "outside political intervention is needed to move the case toward settlement."  [371] ¶ 36.  Plaintiffs recommended hiring John Ashcroft and stated: "Your best chance for settlement is to put the case in the strongest position possible, and have Mr. Ashcroft or whomever you designate move forward in the political arena aggressively."  [371] ¶¶ 37–38.  On April 12, 2016, Rumy noted displeasure with this strategy and said he had "no funds to waste with the political hacks you already used . . . ."  [371] ¶ 40.  On June 24, 2016, Plaintiffs reiterated their "recommendation to settle the case through Mr. Ashcroft's Firm."  [371] ¶ 41.  Plaintiffs explained: "The reason for recommending the Ashcroft Firm is that the DOJ is responsible for settling cases and paying damages from the Judgment Fund.  To our knowledge, Mr. Ashcroft maintains good relations with Senior DOJ officials, and should be able to by-pass lower levels of the bureaucracy to negotiate with senior decision makers."  [371] ¶ 41.  Between the Federal Circuit's 2016 ruling and July 16, 2016, the date Zoltek (to at least some extent) fired Plaintiffs, neither party to the litigation initiated settlement discussions or mediation.  [371] ¶¶ 48–51.  And in his deposition, Monco testified that in 2016, he "would not have gone through mediation first."  Instead, he "would have gone through Mr. Ashcroft first, and then [he] would have done the mediation if it became necessary, if you couldn't get through that."  [371] ¶ 47.

Zoltek argues this evidence shows that the case was not on the verge of settling when Zoltek fired Plaintiffs.  But even accepting this argument, it would not be enough to preclude an award of the entire contract fee as a matter of law.  For example, a reasonable factfinder could decide that even though the case might not have settled as quickly if Plaintiffs had remained on the case, the value of the settlement was still entirely or almost entirely attributable to Plaintiffs' work spanning two decades.  Drawing all inferences in the light most favorable to

Plaintiffs, Zoltek has not shown as a matter of law that a full contract fee would not be a reasonable sum for services rendered. While the court expresses no views on the ultimate merits of this question, the court declines to limit the relief available to Plaintiffs at this time.

## Conclusion

For the reasons given above, Monco's motion for summary judgment [305] is denied, Zoltek's motion for summary judgment [367] is denied, Monco's motion for leave to add judicial estoppel as an affirmative defense to Zoltek's counterclaims [387] is granted, and Monco's motion to strike [432] is denied.

Date: March 31, 2021                    /s/ Martha M. Pacold